817 So.2d 1245 (2002)
STATE of Louisiana
v.
Joseph Randy MARCOTTE.
No. 01-1586.
Court of Appeal of Louisiana, Third Circuit.
May 15, 2002.
*1247 Christopher Brent Coreil, District Attorney, Ville Platte, LA, for Plaintiff/Appellee State of Louisiana.
Trent Stuart Brignac, Asst. District Attorney, Ville Platte, LA, for Plaintiff/Appellee State of Louisiana.
Gilbert J. Aucoin, Ville Platte, LA, for Defendant/Appellant Joseph Randy Marcotte.
Court composed of MARC T. AMY, MICHAEL G. SULLIVAN, and GLENN B. GREMILLION, Judges.
GREMILLION, Judge.
The defendant, Joseph Randy Marcotte, was found guilty by a jury of attempted distribution or dispensation of a controlled dangerous substance to a person under eighteen. After denying Defendant's Motion for New Trial, the trial court proceeded to sentence him to fifteen years at hard labor, the first five years to be served without benefit of parole, probation, or suspension of sentence. The trial court also suspended three years of the sentence and ordered three years of supervised probation upon release from prison. Defendant now appeals his conviction and sentence alleging that the trial court erred in allowing the State's questioning of his post-arrest silence; in permitting its questioning of him on evidence of prior crimes, and in giving him an excessive sentence of fifteen years.

FACTS
Defendant is the father of the victim, K.T.A., who was under eighteen at the time of the offense. K.T.A. lived with his mother and did not know his father until he was approximately fourteen years old. On March 2, 2001, Defendant called K.T.A. to ask if he wanted to ride to Alexandria with him to drop off some rented movies. K.T.A. agreed and drove from his mother's residence in Evangeline Parish to his father's house in Rapides Parish, arriving at about 5:00 p.m.
They left for Alexandria in Defendant's vehicle, dropped the movies off as planned, went to a fast-food outlet, and then took Defendant's two younger children[1] back to his residence. Defendant and K.T.A. then proceeded to Avoyelles Parish to buy beer; on the way they smoked marijuana, which Defendant supplied. When they arrived in Bunkie, in Avoyelles Parish, they purchased beer at a filling station. The pair then drove to Chicot Lodge, where they drank beer and shot pool.
In his testimony, K.T.A. said Defendant decided to return to Cheneyville to purchase a rock of crack cocaine. When they arrived in Cheneyville, they stopped at a residence. K.T.A. said he stayed in the vehicle while Defendant went and purchased four or five rocks of crack cocaine. When he returned, they drove back to Chicot Lodge. According to K.T.A., Defendant pulled over along the way and instructed him to retrieve an empty beverage can. Defendant fashioned the can into a crack-smoking receptacle and lit a rock. K.T.A. stated that they drove around and smoked all the rocks in both Rapides and Evangeline Parishes before they got back to Chicot Lodge. K.T.A. testified that they arrived back at Chicot Lodge at around midnight, shot a game of pool, and hung out. According to K.T.A., Defendant then suggested getting another rock of crack so they returned to Cheneyville where Defendant bought a few more rocks. They again drove back toward Chicot Lodge, smoking crack as they traveled; however, *1248 they did not stop at the Lodge this time, but passed it and continued riding around. At this point, K.T.A. said that he began to feel "a little messed up" and passed out in the car.
Defendant proceeded to the residence of Tammy Meadows in Moreau. Meadows helped K.T.A. to a spare bed, where he again passed out. Subsequently, Defendant woke him up to take a telephone call from his mother. He assured her he was alright, but he fell asleep again as soon as the call ended. He then slept the rest of the day, until his mother called again at 2:00 p.m. Shortly thereafter, his mother and maternal grandfather arrived at the Meadows' residence to pick him up. After questioning from his mother, K.T.A. admitted to smoking crack cocaine. She then drove him to a nearby hospital, where he took a urine test. The results of the test were positive for both marijuana and crack. Shortly thereafter, they went to the Evangeline Parish Sheriff's Office, where K.T.A. reported the crime and gave a statement.

RIGHT TO REMAIN SILENT:

QUESTIONS REGARDING POST-ARREST SILENCE
In his first assignment, Defendant asserts that the State improperly questioned him when he took the stand regarding his post-arrest silence. A detective interviewed him after his arrest, but he elected not to speak without a lawyer. In fact, our review of the record indicates Defendant made no statements to police, either pre or post-arrest. His argument before this court is that the State's cross-examination infringed upon his constitutional right to remain silent after arrest. In that regard, he cites State v. Stelly, 93-1090 (La.App. 1 Cir. 4/8/94), 635 So.2d 725, writ denied, 94-1211 (La.9/23/94), 642 So.2d 1309 and State v. Arvie, 505 So.2d 44 (La.1987), arguing that it is improper for the State to impeach him with his post-arrest silence.
At trial, the following colloquy took place between the State and Defendant on cross-examination:
Q. Good afternoon, Mr. Marcotte.
A. Hello.
Q. There's something I don't understand. I don't understand why I just heard that story for the first time a few minutes ago.
A. What do you mean?
Q. How long have you been in jail?
A. Uh ... about four months now.
Q. Have you ever told a deputy the story that you just told this Jury?
A. No, sir.
Q. You mean to tell me that you have been sitting in jail for four months and that very plausible explanation is the explanation as to why you are innocent and you didn't knock on the cell bars, you didn't get the attention of one of these deputies and say, ya'll got this all wrong, let me tell you what happened? You didn't do that?
A. Sir, the deputies uh ... I don't know what talking to a deputy would do. They're ... they're not lawyers or anything.
Q. You heard Joe Demourelle say and testify earlier in this Courtroom that he went and he looked around the areas and he was ... what he was attempting to do was determine whether or not [K.T.A.] was telling the truth.
A. Yes, sir.
Q. He's not in the business of arresting and jailing people who should not be in jail.
A. Yes, sir.
Q. Why didn't you tell him, hey, if you just go talk to these guys you'll find out *1249 I wasn't riding all around smoking crack-cocaine, I was at the bar?
A. Well, when he talked to me uh ... it was like the day or maybe the day after I got here. Uh ... I went in the little conference room down ... down by the jail, and uh ... he asked for a story, and did I want to talk ... talk to ... talk to anybody about it. I says, no, you know, I wanted to have a lawyer or something. I didn't know who he was. He tells me he's a detective. I didn't know that, you know, which he probably was, you know, I mean he is a detective but I didn't want to just come out and start talking. I mean I didn't know what ... I didn't know what was going on. I mean I ... I ... this ... I got arrested on my birthday. I didn't have any idea of these ... of these charges.
Q. So if you get arrested next month for robbing a bank while you were at a family picnic, your just gonna go to jail and sit in jail until it's time for your trial before you tell someone, hey, if you just go talk to the rest of my family they'll tell you that I couldn't of robbed that bank?
A. Well, I....
Q. You'll just wait and take your chances with the Jury?
A. I've learned ... I've learned a little bit.
By Mr. West: Let me enter an objection, Your Honor. I mean, first of all, this is ... I don't know where he's going with it, you know, and....
By ADA Brignac: I think it's simple where I'm going and I don't think it's objectionable.
By Mr. West: .... and ... you know, second of all, it breaches into the attorney-client privilege concerning what we discussed about what he should do period.
By ADA Brignac: I'm not going into attorney-client privilege. I want to know what he told the deputies and if he didn't, why not?
A. Like I said it's nothing ... I mean....
By the Court: He's on cross examination.
A. Sir?
By Mr. West: Nothing.
A. All like I said, I mean uh ... the deputies are here just to uh .... watch over prisoners. They're ... they're not people to talk to about the cases. I never thought so.
After the verdict, Defendant filed a Motion for New Trial, making essentially the same arguments for a new trial as he is making to this court: a violation of the attorney-client privilege and impingement upon his constitutional right to remain silent after arrest, under Stelly and Arvie. We note Defendant's contemporaneous objection rested only upon the attorney-client privilege; however, it was not timely, as he had already answered a number of questions by the time his counsel objected and he failed to ask for either a mistrial or an admonition.
Initially, we note that the supreme court in Arvie denied relief due to the lack of a contemporaneous objection. Therefore, Defendant's constitutional argument could be treated as non-reviewable based upon the contemporaneous objection rule. La.Code Crim.P. art. 841. Based on our review of the jurisprudence, whether Defendant's Motion for New Trial preserved the issue for appellate review is not settled law. The first circuit has stated squarely that a motion for new trial does not preserve or revive an issue that was not preserved via contemporaneous objection. State v. Moody, 00-886 (La.App. 1 Cir. 12/22/00), 779 So.2d 4, writ denied, 01-0213 (La.12/7/01), 803 So.2d 40. The second and fourth circuits have taken a similar *1250 view. State v. Lowery, 33,905, 33,906 (La. App. 2 Cir. 2/28/01), 781 So.2d 713; State v. Green, 98-912 (La.App. 4 Cir. 9/9/98), 731 So.2d 286, opinion reinstated on rehearing, 98-912 (La.App. 4 Cir. 12/9/98), 731 So.2d 298, writ denied, 99-0043 (La.5/7/99), 741 So.2d 28. We have voiced a similar approach, but proceeded to a brief review of the merits. State v. Corley, 97-235 (La.App. 3 Cir. 10/8/97), 703 So.2d 653, writ denied, 97-2845 (La.3/13/98), 712 So.2d 875. The fifth circuit appears to have taken the opposite approach when it treated a new-trial motion as preserving or reviving an issue that had not been preserved via trial objection. State v. Richthofen, 01-500 (La.App. 5 Cir. 11/27/01), 803 So.2d 171.
In our opinion, a motion for new trial does not preserve or revive an issue not properly and timely raised by objection. This is true because, by the time a new-trial motion is made, the trial court has lost its best opportunity to correct the error at issue. However, as in Corley, we will address the constitutional right to silence issue in light of the jurisprudence cited above. We do this in part because of a recent per curiam opinion of the Louisiana Supreme Court, where it held that an objection based upon relevancy preserved an argument regarding whether the State had improperly impeached a defendant at trial using his silence at a preliminary hearing. State ex rel. Walker v. State, 98-0916 (La.3/19/99), 733 So.2d 1178. We, however, note that a relevancy objection is more closely akin to the proper objection than the objection made in the case at hand, but both objections were based on totally different issues than the constitutional right to silence.
First, we shall analyze Defendant's argument regarding violation of the attorney-client privilege which was preserved by an objection. The State's questions did not necessarily intrude into the attorney-client privilege. In other words, the questions asked could have provoked answers that had nothing to do with the privilege. Further, Defendant's responses did not show that his answers described or recounted any communications with his attorney. Thus, the objection was properly overruled by the trial court. Therefore, this assignment of error lacks merit.
Next, we shall address the possible breach of Defendant's right to post-arrest silence. Our review of the testimony at issue reveals that the State deliberately sought to impeach Defendant with his post-arrest silence. Such a reference to, or use of, a defendant's post-arrest silence is prohibited by the jurisprudence. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); see also Anderson v. Charles, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). Defendant also cites Arvie, 505 So.2d 44, for this proposition. Again, as previously noted, the Arvie court ultimately denied relief based on the contemporaneous objection rule. Id.
However, Doyle "is not without exceptions." State v. Bell, 446 So.2d 1191, 1193 (La.1984). In Bell, a case cited by Arvie, the defendant had vigorously challenged the thoroughness of the State's investigation in his opening statement. The supreme court observed:
Defense counsel was clearly making reference to the state's failure to investigate, in order to boost his client's position in the eyes of the jury by inferring that he was unjustly, or mistakenly, charged with forgery.
In this case since defense counsel suggested to the jury that the state had failed to investigate the matter, and implied that, had it been investigated properly, the forgery charges would not have been brought against the defendant, the state was allowed to respond by asking the defendant and the investigating officers *1251 whether or not they tried to determine the defendant's involvement by questioning him at the time of his arrest. The defendant may not tell the jury that the state's case is the result of improper investigation without allowing the state to try to show the jury that the investigation was indeed thorough, or at least sufficiently thorough as to include inquiries of the defendant in order to get leads which might verify, or dispute, defendant's noninvolvement.
Id. at 1194.
In the present case, Defendant also challenged the thoroughness of the State's investigation. Defense counsel questioned Deputy Shawn Ekhart and Detective Joe Demourelle about the extent of the investigation. The questioning of Ekhart focused on K.T.A.'s credibility, and the fact that Ekhart had not seen the drug-test results when he talked to K.T.A. Some of the cross-examination of Demourelle followed a similar vein. However, Defendant also delved into the detective's efforts, or lack thereof, to find and interview other witnesses as noted by the following cross-examination of Detective Demourelle:
Q. Okay. Did you ... after that point, did you perform any further investigation?
A. Did I perform in ... uh ... uh ... I attempted to find other witnesses, uh... which some were ... mostly unsuccessful, yes.
Q. Okay, um ... and I'm not gonna ask you what you did talk to but have you ... you spoken to any other witnesses other than Ms. Andrus and Mr. uh ... [K.T.A.]?
A. No.
Q. As of today?
A. No.
Q. After K.T.A. wrote down his movements did you ever attempt to verify those movements?
A. Yes.
Q. Were you ever able to do that?
A. No.
Q. So as of today all we have is his statement as to what happened?
A. Yes.
Also, Defendant's opening statement argued a lack of evidence, and implied that the State had filed charges automatically, based solely on K.T.A.'s allegations:
[C]ause if I was home with my son at night and he turns me in to Child Protection or whatever, how do I prove it didn't happen? As parents I'm sure all of you have probably thought about that type of a situation, and it's very easy to be charged with a crime, and most of you probably don't know that it's ... one person walks into the D.A.'s Office, files an affidavit, and that's it. The D.A. prosecutes. It's his job. I defend my job. Your job is to decide whether or not it happened....
Although Defendant's attack on the State's investigation was not as explicit as that in Bell, Defendant "opened the door" to questions about his post-arrest silence. As the Bell court explained:
The case we review here is another situation in which it can be fairly said that the defendant invited the state's inquiry into what happened in the early stages of the investigation. The state had a legitimate purpose in questioning the defendant and the investigating officer about the defendant's arrest and defendant's opportunity to explain what had happened. That was to rebut a defense contention that the prosecutor had failed to investigate the matter thoroughly before bringing charges against the defendant. Only coincidentally was there at the same time a prejudicial effect upon the defendant when this exploration also pointed up his post-arrest silence. The defendant himself broached the subject of a lack of investigation, *1252 which prompted the state's attempt at refutation. The incidental consequence was that the defense lowered the bar and "discarded the [Fifth Amendment] shield which the law had created to protect him." [U.S. v. Fairchild,] 505 F.2d [1378,] 1383 [ (5th Cir. 1975) ].
Id. at 1193-1194.
We shall not limit Bell to cases in which a defendant uses his opening statement to attack the thoroughness of the State's investigation. Once a defendant raises questions regarding an investigation's thoroughness during trial, it is a theme he may well be expected to revisit during his closing argument to the jury. Thus, the State has a legitimate purpose in asking questions about a "defendant's opportunity to explain what happened." Id.
Finally, the State's questions did have the effect of impeaching Defendant's version of the night of March 2, 2001. He essentially gave an alibi account of what he did on that night, claiming he and K.T.A. stopped by the home of Mike and Angela Bordelon while on the way to Chicot Lodge in order for K.T.A. to use the restroom. According to Defendant, they stayed there for twenty-five to thirty minutes before leaving for the Lodge. Upon arriving there, Defendant said K.T.A. met some friends outside the Lodge and he went inside and drank beer and shot pool. He claimed that he stepped outside at about 10:00 p.m. to check on K.T.A., only to find him talking with friends. Defendant testified he returned to the bar and later checked on K.T.A. around 11:30 p.m., this time finding that he and his friends were gone. Finally, at around 2:00 a.m., he checked again on his son, this time finding him in a noticeably impaired state, such that he was concerned and did not want to take him home in that condition.
Significantly, Defendant testified that he frequented the Chicot Lodge often and that he knew everybody in the bar. He particularly recalled seeing Ryan Sparks and Ralph Blood, the bar owner, that night. He also mentioned seeing Bobby Blood, his uncle, and a gentleman named Huckie, the former bar owner. Surely, the fact that Defendant failed to tell the authorities the names of anybody who could corroborate his story, choosing instead to stay in jail for four months before telling the jury, is clearly impeachment testimony which the jury should be allowed to consider. Therefore, his post-arrest silence is at issue and the evidence of it becomes admissible. Accordingly, for these reasons, this assignment of error is without merit.

EVIDENCE OF OTHER CRIMES OR BAD ACTS
In his second assignment, Defendant contends the lower court erred by allowing the State to adduce evidence regarding other crimes or bad acts. Defendant also contends the jury reached an improper responsive verdict.

Other Crimes Evidence
Use of evidence of other crimes or bad acts is prohibited by La.Code Evid. art. 404(B)(1), which states:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part *1253 of the act or transaction that is the subject of the present proceeding.
In his direct examination, Defendant claimed he had never before seen his son in the condition he was in on March 2-3, 2001. During cross-examination, the State asked Defendant if he had ever seen K.T.A. smoke marijuana or crack-cocaine. He answered in the negative to both questions. Subsequently, on rebuttal, the State called Luke Litton, who testified that he had seen K.T.A. smoke marijuana and smoke and be "messed up" from the effects of crack-cocaine in the presence of Defendant, other than at the incident at issue. K.T.A. also testified on rebuttal that he smoked marijuana and crack-cocaine in his father's presence at a time other than the night in question.
Initially, we note that the mere fact that K.T.A. smoked marijuana and crack-cocaine in Defendant's presence does not necessarily mean Defendant committed a crime or committed a bad act; however, such evidence is certainly prejudicial. The fact that Defendant claimed he had never before seen K.T.A. in that condition opened the door to Defendant's other observances of K.T.A. engaged in the use of illegal drugs or alcohol. We note a recent case in which our colleagues on the second circuit wrote regarding the use of other crimes evidence:
The prosecutor merely asked questions regarding issues that had been raised by the defendant. The defendant "opened the door" to this line of questioning and cannot now complain that the state questioned him concerning these matters. See, State v. Spencer, 96-248 (La. App. 3d Cir.11/6/96), 683 So.2d 1326, writ denied, 96-2938 (La.5/9/97), 693 So.2d 773; State v. Diaz, 93-1309 (La. App. 3d Cir.4/6/94), 635 So.2d 499, writ denied, 94-1189 (La.9/16/94), 642 So.2d 191.
State v. Williams, 32,993, p. 5 (La.App. 2 Cir. 3/1/00), 754 So.2d 418, 423.
Further, when a defendant opens the door to such evidence, Prieur notice is not required. State v. Clark, 95-1354 (La. App. 3 Cir. 12/11/96), 687 So.2d 470, writ denied, 95-0715 (La.6/13/97), 695 So.2d 986. Clearly, Defendant, in his direct testimony, opened the door to questions regarding whether he had previously seen his son in an inebriated state. Thus, the State was free to question him further about that issue. Therefore, the use of this evidence to further impeach Defendant was proper. Accordingly, this assignment of error lacks merit.

Compromise Verdict
Under this assignment, Defendant contends that the jury's verdict of attempted distribution or dispensation of a controlled dangerous substance to a person under eighteen years of age, who is at least three years his junior, is improper. He argues that the evidence does not support attempt. He also made this argument in his Motion for New Trial. However, Defendant acknowledges that the jury reached a compromise verdict, and one authorized as a responsive verdict by law. La.Code Crim.P. art. 814. Further, he acknowledges he did not object to the inclusion of attempted distribution as a possible verdict.[2]
Notwithstanding the above, he points out that the compromise verdict can still be overturned if the evidence does not support the charged offense. Stelly, 635 So.2d at 730. We note State ex rel. Elaire *1254 v. Blackburn, 424 So.2d 246, 251 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983), which held that when a defendant does not timely object to a responsive verdict, such a verdict may be upheld if the evidence supports the charged offense. In this regard, Defendant's argument is based on sufficiency of evidence and actually an attack upon K.T.A.'s credibility.
It is well-settled that credibility issues are matters of weight, not sufficiency. Further, the credibility issues that Defendant now raises were before the jury. It heard that K.T.A. made prior inconsistent statements to police and at a pre-trial hearing, mainly regarding details of what drug was used, at what point in the evening, and the amounts used. The jury also heard defense witnesses who contradicted K.T.A.'s version of events by their testimony of Defendant's movements on the night of the offense.
Under cross-examination, K.T.A. admitted that he told a detective, in a statement given approximately two days after the offense, that he and Defendant had driven to Alexandria on business and smoked marijuana on the way back. This did not match the version of events he gave at trial. Also, his statement indicated that Defendant bought crack the first time they returned to Cheneyville. Again, this did not match the time-sequence of K.T.A.'s trial testimony in which he stated that they did not go to Cheneyville for crack until after their first visit to Chicot Lodge. Further, the evening after the offense, K.T.A. handwrote a statement for another officer. In that statement, he mentioned smoking crack during the trip between Cheneyville and Bunkie, which would have been before the first trip to Chicot Lodge. Also, at a pre-trial hearing, K.T.A. testified that Defendant bought one-hundred dollars' worth of crack during the second "buy," while at trial, he said it was sixty dollars' worth. Defendant also tried to show an inconsistency regarding when K.T.A. told his mother that he had used crack. The jury reasonably determined that any discrepancies and inconsistencies in K.T.A.'s testimonies were not so great as to render his testimony not credible. K.T.A. admitted he had some difficulty recalling specifics, due to the substances he consumed on the evening of the offense.
On the other hand, two of Defendant's witnesses, John Sparks and Ryan Sparks, testified about activities at Chicot Lodge on the night in question. John testified that at approximately eleven o'clock on the night of the offense, he saw K.T.A. with some other boys in the parking lot of Chicot Lodge. He did not see K.T.A. smoke crack, but he testified that K.T.A. had four "rocks" in his hand, and another of the boys had a can.[3]
Ryan, John's nephew, testified that he was in the bar at Chicot Lodge from about eleven o'clock until two in the morning. He said he saw Defendant there off and on throughout that time-period, but never saw K.T.A. Ryan admitted being discharged from the Marines due to "a D.W.I. and other alcohol related incidences." He further testified that he drank beer for much of the day of the offense. John's testimony bore internal inconsistencies. He claimed to have driven to Chicot Lodge to see Ryan, but although he saw his nephew's car, he did not stop and look for him because he was "running late." He also admitted a prior drug conviction and prior crack use, and that he was Defendant's friend. Accordingly, the jury could have reasonably disregarded their testimony.
*1255 Tammy Meadows also testified for Defendant. She stated that on the morning of March 3, Defendant called her to ask if he could sleep at her residence. She was getting ready for work and told Defendant that he and K.T.A. could come there to sleep. She testified that the boy did not look messed up when he and Defendant arrived, which conflicted with Defendant's testimony. Although K.T.A. had testified that there was a young girl at Meadows' residence, Meadows said there was no such girl. She acknowledged she was a good friend of Defendant's and that she had a 1986 conviction for distribution of marijuana.
The credibility and weight given to evidence are matters for the factfinder. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). In King, the supreme court refused to second-guess the credibility assessments of the factfinder. Therefore, we will not second-guess the jury's credibility assessment, especially in the light of an argument directed at a legislatively-authorized responsive verdict that was not objected to at trial. K.T.A.'s testimony provided direct evidence of every element of the charged offense. Defendant was charged under La.R.S. 40:981(B). That portion of the statute states:
Any person who is at least eighteen years of age who violates R.S. 40:966 or R.S. 40:967 by distributing a substance listed in Schedules I or II which is a narcotic drug to a person under eighteen years of age who is at least three years his junior shall, upon conviction, be punished by a term of imprisonment of up to twice that authorized by R.S. 40:966 or R.S. 40:967 or by payment of not more than twice the fine authorized by R.S. 40:966 or R.S. 40:967, or both.
The evidence was clear that Defendant was at least eighteen at the time of the offense and K.T.A. was under eighteen and at least three years Defendant's junior. According, to K.T.A., Defendant was the person who bought the cocaine and gave it to him. Every element of the crime charged was proven beyond a reasonable doubt. Therefore, the compromise verdict was proper, rendering this assignment of error without merit.

EXCESSIVE SENTENCE
In his final assignment, Defendant argues that his fifteen-year sentence was excessive. In the proceeding in the trial court, Defendant merely objected to the sentence without elaboration preserving only a constitutional claim of excessiveness. La.Code Crim.P. art. 881.1; State v. Erwin, 98-1156 (La.App. 3 Cir. 2/3/99), 734 So.2d 666. The supreme court has explained the analysis of excessive-sentence claims:
The only relevant question on review, however, was "whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984) (citing State v. Williams, 412 So.2d 1327 (La.1982)).
State v. Cook, 95-2784, p. 3 (La.5/31/96), 674 So.2d 957, 959, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). Further, the supreme court noted, "A trial judge has broad sentencing discretion because he or she remains in the best position to assess the aggravating and mitigating circumstances presented by each case." Id. at 958.
La.R.S. 40:981(B) provides a "term of imprisonment of up to twice that authorized by R.S. 40:966 or R.S. 40:967 or by payment of not more than twice the fine authorized by R.S. 40:966 or R.S. 40:967, or both" for a conviction of distribution of cocaine by a person over the age of eighteen to a person under eighteen, who is at *1256 least three years his junior. La.R.S. 40:967(B)(4)(b) provides the sentence for distribution of cocaine:
[A] term of imprisonment at hard labor for not less than five years nor more than thirty years, with the first five years of said sentence being without benefit of parole, probation, or suspension of sentence; and may, in addition, be sentenced to pay a fine of not more than fifty thousand dollars.
Finally, because Defendant was convicted of attempted distribution to a minor, La. R.S. 14:27 applies, which provides for a sentence of "one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both." Therefore, Defendant was subject to a sentence from five to thirty years in prison. Thus, his sentence of fifteen years is a mid-range sentence.
In State v. Blanchard, 97-562 (La.App. 3 Cir. 10/29/97), 702 So.2d 1162, the defendant injected her 13 year old daughter with cocaine on thirty to forty occasions, and we held that a twenty-five year sentence for distribution, pursuant to La.R.S. 40:967, was not excessive. In State v. Williams, 599 So.2d 465 (La.App. 2 Cir. 1992), where the defendant was using a minor as his seller, the second circuit held that a twenty-year sentence for distribution of cocaine was not excessive. In State v. Craig, 596 So.2d 297 (La.App. 3 Cir.1992), the defendant was convicted of five counts of distribution of cocaine. Some of her clientele included children. We held that her sentence of five concurrent twelve-year sentences, plus a $1,500 fine, was not excessive.
In view of the sentences in these cases and Defendant's prior criminal history, we find that his sentence is not excessive. Thus, this assignment of error lacks merit.

ERRORS PATENT
We review all appeals for errors patent on the face of the record. After reviewing the record, we find there is one error patent. Defendant was sentenced immediately after the trial court's denial of his motion for a new trial. La.Code Crim.P. art. 873 mandates a twenty-four hour delay between the denial of such motions and the imposition of sentence. The first issue we must resolve is whether counsel's agreement to proceed with sentencing acted as a waiver of the delay set by Article 873.
After denying the motion for new trial, the trial court asked, "You want to bring him up for sentencing?" to which defense counsel replied, "Uh ... yes, Your Honor, if I may ... if I may make some...." The record reflects that defense counsel then expressed his desire to make a statement prior to sentencing and he proceeded to make a lengthy, point by point objection to the information contained in the presentence investigation report. After listening to both parties' arguments regarding the alleged inaccuracies in the report, the trial court proceeded to sentence Defendant, after which defense counsel objected "to the sentencing." It is clear from the record that this objection was to the sentence imposed, rather than the fact the sentencing proceeding was held, as counsel did not raise this objection at any other point of the proceeding, and appeared to be prepared to proceed with the sentencing.
Recently, in State v. Williams, 01-998 (La.App. 3 Cir. 2/6/02), 815 So.2d 908, we found the statement "Defense is ready, Your Honor," to the trial court's inquiry "You ready for sentencing?," acted as an express waiver of the sentencing delay contained in Article 873.
Similarly, in State v. Schmidt, 99-1412, pp. 53-55 (La.App. 3 Cir. 7/26/00), 771 *1257 So.2d 131, 159-60, writ denied, 00-2950 (La.9/28/01), 798 So.2d 105, cert. denied, ___ U.S. ___, 122 S.Ct. 1205, 152 L.Ed.2d 143 (2002) (footnote omitted), we stated:
In State v. Flowers, 337 So.2d 469 (La. 1976), the supreme court held the defendant expressly waived the delay by replying affirmatively when asked by the trial court if he wished to be sentenced that date. Our colleagues on both the first and fifth circuits have also found implicit waivers of Article 873's delay when the defendant announces his readiness for sentencing. State v. Steward, 95-1693 (La.App. 1 Cir. 9/27/96); 681 So.2d 1007; State v. Lindsey, 583 So.2d 1200 (La.App. 1 Cir.1991), writ denied, 590 So.2d 588 (La.1992), and State v. Ferrell, 94-702 (La.App. 5 Cir. 5/30/95); 656 So.2d 739, writ denied, 95-2360 (La.4/18/97); 692 So.2d 433. In State v. Diaz, 93-1309 (La.App. 3 Cir. 4/6/94); 635 So.2d 499, writ denied, 94-1189 (La.9/16/94); 642 So.2d 191, this court noted for the first time the situation where neither the defendant nor his attorney objected to sentencing being held immediately after denial of their motion for new trial and they did not assign the Article 873 violation on appeal. We, however, declared that we could find that the defendant and his attorney impliedly waived the delay by their active participation in the sentencing hearing. Since the defendant received the minimum sentence under the statute, we found the error harmless.
We are cognizant of our recent decision [in] State v. Dronet, 97-991 (La. App. 3 Cir. 11/4/98); 721 So.2d 1038, where we found defense counsel's statement that he was ready for sentencing did not constitute a waiver of the twenty-four-hour delay required by Article 873. In Dronet, even though we could not find any prejudice as a result of the trial court's failure to observe the delay in sentencing, we noted the strict application of Article 873 as suggested by State v. Augustine, 555 So.2d 1331 (La.1990) and remanded the case for resentencing because the defendant challenged his sentence on appeal. Id. at 1040. See also State v. Williams, 96-37 (La.App. 3 Cir. 6/26/96); 677 So.2d 692. However, we can distinguish this case from Dronet since Defendant presented substantial evidence at his scheduled sentencing hearing following the trial court's denial of his motion to reconsider the motion for a new trial. Even though Defendant challenged his sentence on appeal, he can demonstrate no prejudice in the trial court's failure to wait twenty-four hours after the denial of the motion. To support our conclusion, we quote from the trial court's decision on sentencing:
I've listened carefully to all of the evidence presented to me in the form of testimony here today, and in the form of letters received from concerned persons in the community on both sides of the issue. I have considered, applied, and given weight to the sentencing guidelines provided by the Louisiana Code of Criminal Procedure, Article 894.1.
I have looked everywhere that I can look. I've given a great deal of thought over the past 4 months to this day, knowing that it would come. I have studied carefully everything that has been presented to me. I have invited any information that either side wished to present to me, so that when I do sentence the defendant, it will be with as much knowledge as I can possibly have about everything concerned.
I have looked everywhere for compelling reasons to exercise leniency in this case. Certainly, the defendant's life is unique among convicted felons. *1258 We don't normally see persons of his status in the community, his professional status for sentencing. I have listened to what everyone has said, with regard to his good works, and I have no reason to doubt them. But in the final analysis, the punishment must fit the crime. All of the good things that he has done in his life, in my view, cannot tip the balance of the scales, in light of the deliberate, cruel, and extremely serious crime that he has committed.
Clearly, the trial court carefully considered the sentence for some time before pronouncing it. There is no indication that a twenty-four-hour delay would have resulted in a lesser sentence, as suggested in Augustine, 555 So.2d 1331. Therefore, we find that Defendant implicitly waived the twenty-four-hour waiting period by participating in the sentencing hearing, responding affirmatively to the trial court's question, "[I]s your client prepared for sentencing?," and failing to lodge a contemporaneous objection when the trial court proceeded with sentencing.
In the instant case, Defendant announced he was ready for sentencing and presented substantial and well informed argument relative to the pre-sentence investigation. Further, the trial court carefully considered its sentence stating it had reviewed the pre-sentence investigation report, recalled Defendant's trial testimony, and considered his extensive criminal history before pronouncing sentence. Finally, Defendant can show no prejudice in the trial court's failure to wait twenty-four hours after denial of the motion for a new trial.
Accordingly, even though we note the potential error patent, we find that Defendant waived the twenty-four hour waiting period contained in Article 873.

CONCLUSION
Defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The victim's step-brother and step-sister.
[2] His current brief indicates he did object, but a comparison of the brief language to that in the original motion and comments made at the motion hearing, indicate that he did not object to the inclusion of the verdict. A subsequent statement in his brief clarifies that he did not object.
[3] During K.T.A.'s testimony it had been explained that a beverage can can be fashioned into a makeshift pipe to smoke crack cocaine.