412 So.2d 1082 (1982)
STATE of Louisiana
v.
Alvin SAM.
No. 81-KA-0897.
Supreme Court of Louisiana.
April 6, 1982.
*1083 William J. Guste, Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., J. William Pucheu, Dist. Atty., Richard W. Vidrine, Asst. Dist. Atty., for plaintiff-appellee.
Preston N. Aucoin, Ville Platte, for defendant-appellant.
DIXON, Chief Justice.[*]
Defendant, Alvin Sam, was indicted for the second degree murder of Milton Leday in violation of R.S. 14:30.1. After a trial by jury, defendant was found guilty as charged and sentenced to life imprisonment without benefit of probation, parole or suspension. Defendant appeals, asserting thirteen assignments of error.
On November 30, 1979 Alvin Sam joined a poker game in the "gambling shack" of the Happy Landing Club in Ville Platte, Louisiana. Sam sat down next to Milton Leday and an argument over the rules of the game soon developed between the two men. The victim stood up and slapped defendant on the side of the head. Sam fell back against a handrail, pulled a .22 caliber handgun and fired one shot into Leday's abdomen. On December 2, 1979 the victim died from the gunshot wound.
Assignment of Error No. 5
Defendant asserts that a mistrial should have been granted because of questions asked during the state's cross-examination of Sam. The following exchange occurred between the district attorney and defendant:
"Q. Now why did you refuse to give a statement when they first asked you? Why did you refuse to tell them what happened on the night you were arrested? Tell us why?
A. Because I had decided I wasn't going to give no statement until I get a lawyer in my presence.
Q. Why?
A. To advise me of my rights.
Q. Well you were already advised of your rights, weren't you?
A. Yeah, but I needed a legal counsel, you know, attorney, you know. I wanted to talk to first before I gave a statement.
Q. Now, were you or were you not advised of your rights when you arrested that man?
A. They advised me of my rights.
Q. And who advised you?
A. One of the officer. They read it to me.
Q. And then you refused to give a statement?"
Defense counsel claims that the district attorney badgered Alvin Sam about the exercise of his constitutional right to remain silent thereby creating prejudice against him in the minds of the jurors.
In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the prosecutor sought to impeach the defendant's exculpatory trial testimony by cross-examining him about his failure to tell the story after given Miranda warnings at the time of his arrest. The court held that the use of an accused's post-arrest silence after receiving *1084 Miranda warnings for purposes of impeachment violated the due process clause.
This court followed Doyle v. Ohio, supra, in State v. Montoya, 340 So.2d 557, 560 (La.1976). In that case, the arresting police officer was asked by the prosecutor whether the accused told the officer where he had procured drugs involved in the arrest. This court held:
"In the instant case the defendant did not take the stand. Thus, there is even less justification here for the State to call attention to his silence at the time of arrest than there was in Doyle, because the argument cannot be made that he was under cross-examination and thus fair game for impeachment by use of his silence at the time of his arrest. Therefore, we conclude it was clearly reversible error for the trial court to permit the State to use the arrested person's silence against him at trial...."
In a later case, State v. Mosley, 390 So.2d 1302, 1305-06 (La.1980), the court addressed this question again. The prosecutor was allowed to ask two police officers called by the state if the defendant had been advised of his constitutional rights upon arrest. The conviction was upheld despite the court's disapproval of the conduct of the prosecuting attorney because the reference to the accused's silence was oblique and obscure:
"Although we disapprove of the conduct of the prosecuting attorney in this case, we cannot say that the oblique and obscure reference to the defendant's post-arrest silence amount to reversible error. We agree with the defendant that whether he was advised of his rights at the time of arrest was irrelevant. However, the prosecutorial examination did not stress the right to remain silent or attempt to elicit testimony regarding defendant's failure to respond to police questioning. The prosecutorial actions in this case, albeit improper, cannot be said to have resulted in prejudice to the defense of the accused."
Most recently, in State v. Brown, 395 So.2d 1301 (La.1981), the prosecution introduced a blank rights form into evidence. This court found no prejudice had resulted to the defendant because the form was offered only to show that he had been advised of his constitutional rights. No attempt was made by the prosecution to elicit testimony concerning the accused's failure to respond to police questioning; in fact the accused made several exculpatory statements during the interrogation. Further, the defense had opened the door to the defendant's attitude upon arrest, thereby entitling the state to produce evidence to rebut the defense's contention.
In the case before us the prosecutor emphasized Sam's refusal to give a statement after his arrest. Although the defendant can be fully cross-examined when he takes the stand and is subject to impeachment by use of his silence under certain circumstances,[1] it is fundamentally unfair to allow the arrested person's silence to impeach him at trial, as explained in Doyle v. Ohio, supra:
"... The warnings mandated by [Miranda], as a prophylactic means of safeguarding Fifth Amendment rights, see Michigan v. Tucker, 417 U.S. 433, 443-444, 41 L.Ed.2d 182, 94 S.Ct. 2357 [2363] (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more *1085 than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See United States v. Hale, [422] U.S. [171], at 177, 45 L.Ed.2d 99, 95 S.Ct. 2133 [2137 (1975)]. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in United States v. Hale, supra, at 182-183, 45 L.Ed.2d 99, 95 S.Ct. 2133 [2139], put it very well:
`[W]hen a person under arrest is informed, as Miranda requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.... Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from Miranda warnings that this would not be the case.'" (Footnotes omitted). 426 U.S. at 617, 96 S.Ct. at 2245, 49 L.Ed.2d at 97-98.
Here, the defendant took the stand and offered an otherwise plausible explanation to explain his conduct. To impeach him by casting doubt on his defense, using his constitutional right to silence to establish an inference that the defense was fabricated, constitutes reversible error.
To aid in a retrial of this case, other meritorious assignments raised by defendant will be discussed.
Assignments of Error Nos. 4 and 6
Defendant urges that the trial court erred in forbidding his testifying about prior incidents between himself and the victim's relative, Melvin Leday. The trial court instructed defendant not to mention any trouble between himself and the victim's family because only incidents between the victim and defendant were relevant to show the victim's violent character.[2]
Defendant argues that this testimony was relevant to show why defendant began carrying a pistol and was not offered as evidence of the victim's dangerous character. As Sam, himself, told the judge (the jury had been removed):
"But Your Honor, what I was trying to say, that's the main reason I was carrying a gun because I was mistreated and I was abused by the Ledays. I mean I was afraid of the Ledays. That's why I was carrying a gun."
When offered to prove the reason defendant was armed, this testimony would bear directly on the self-defense theory and would be relevant.
The defense also sought to introduce a logbook entry from the sheriff's office which showed that Sam came in on November 26, 1977 and declared that the Ledays beat him with chairs at the Happy Landing. The court refused to allow this entry into the record for the same reasons noted above. We cannot rule on all the evidentiary questions which might be raised by such an offering, but it is not irrelevant.
Assignment of Error No. 7
By this assignment, defendant contends that the trial court erred in not *1086 allowing the introduction of a knife found in the area where the victim had lain after the shooting. The defense called Wilson Joseph who testified that he was present at the Happy Landing on the night of the shooting and that he found an open pocket knife on the ground outside the tavern. He stated that the knife displayed in court was the one he found at the scene. Joseph picked up the knife and put it in his pocket; Sam's sister and another man purportedly observed Joseph's actions. Defendant argues that the knife is crucial to show the decedent was armed and that Sam acted in self-defense.
In order to introduce demonstrative evidence, it suffices if the foundation laid establishes that it is more probable than not that the object is the one connected with the case; lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than to its admissibility. State v. Williams, 362 So.2d 530 (La.1978); State v. Provost, 352 So.2d 661 (La.1977). It appears that a proper foundation for admission of the knife was laid; whether or not the knife belonged to the decedent is a question of fact for the jury.
Assignment of Error No. 8
By this assignment, defendant submits that error was committed by the court's refusal to allow the accused to introduce the victim's record of prior convictions to demonstrate that the victim had a dangerous character. Defendant relies on R.S. 15:482 which provides:
"In the absence of evidence of hostile demonstration or of overt act on the part of the person slain or injured, evidence of his dangerous character or of his threats against accused is not admissible."
Evidence of "hostile demonstration or of overt act" was presented by the defense.[3] Defendant claims that this provision permits introduction of criminal records. The state argues that this provision must be read in conjunction with R.S. 15:479 which states:
"Character, whether good or bad, depends upon the general reputation that a man has among his neighbors, not upon what particular persons think of him."
It is the state's position that dangerous character cannot be proven by specific acts, such as conviction records, but only by evidence of general reputation. The trial court agreed with the prosecution.
In State v. King, 347 So.2d 1108, 1111 n.3 (La.1977), this court observed:
"With respect to the admissibility of the decedent's criminal record, the traditional rule is that character evidence is established by general reputation, not by specific acts. La.R.S. 15:479. Nevertheless, evidence of specific acts is relevant when a plea of self-defense is raised to show the defendant's state of mind, which is a material issue in such cases. La.R.S. 14:20. See State v. Lee [331 So.2d 455 (La.1976)], supra. Therefore although prior threats and violent acts, whether against the accused or against others, might be inadmissible as character evidence, they are admissible if the defendant knew of them at the time of the offense. Thus, in the instant case, the victim's prior record would be inadmissible unless there was a showing that the defendant knew of the record at the time of the homicide."
Under State v. King, supra, the victim's prior record may be admitted if a showing is made that Sam knew of the record at the time of the shooting. In this instance, the traditional rule against proof of character by specific acts, R.S. 15:479, gives way to permit a defendant to prove his knowledge of the victim's violent propensity. No showing was made that Sam knew of the acts contained in Milton Leday's police record; however, Sam testified that he knew the victim "had hurt several people before" and had "beat up and cut up a dude across *1087 town." He also stated that Paul Richard and Valmond Bellard had been victimized by the decedent. There is no indication whether these individuals are named as victims in Leday's police record or whether the incidents referred to by Sam are contained in the record. If such a connection can be made upon retrial, the victim's record may be admissible.
For these reasons, defendant's conviction is reversed and the case remanded to the district court for a new trial.
KLIEBERT and KLEES, JJ. ad hoc, dissents.
DOUCET, J. ad hoc, dissents with reasons.
NED E. DOUCET, Justice Ad Hoc (dissenting).
I disagree with my learned brethren that the exchange between the Prosecutor and the Defendant, complained of in Assignment of Error Number 5, constituted reversible error.
I do agree that Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) specifically prohibits the prosecutor from using a defendant's post-Miranda warning silence to impeach the defendant.
I do not agree that in this case the prosecutor did so, or attempted to do so. While cross examining the defendant, the prosecutor asked a short series of questions concerning Sam's silence after having been advised of his rights, as set forth in Miranda.
In this case, the District Attorney was clearly not seeking to impeach but rather was seeking to establish that the defendant had been properly advised of his rights at the time of his arrest. Only one question concerned Sam's not having given a statement. The other questions complained of by the defense addressed the sufficiency of the warnings. While I do not wish to encourage prosecutors to indulge in this type of questioning, I do not agree that in this case the questions were impermissible under Doyle, supra. It is my opinion, rather, that these questions fall squarely within this Court's holding in State v. Brown, 395 So.2d 1301 (La.1981); that these questions were designed to show the sufficiency of the post-arrest warnings, and that there resulted no prejudice to the defendant.
Therefore, I respectfully dissent.
NOTES
[*] Judges Ned E. Doucet, Jr. of the Third Circuit and Thomas J. Kliebert and Robert J. Klees of the Fourth Circuit, participated in this decision as Associate Justices Ad Hoc, joined by Chief Justice Dixon and Associate Justices Calogero, Dennis and Watson.
[1] In Doyle v. Ohio, supra, the court noted one such circumstance:

"It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. United States v. Fairchild, 505 F.2d 1378, 1383 (CA5 1975)." Id. at 619-620 n. 11, 96 S.Ct. at 2245 n. 11, 49 L.Ed.2d at 98-99 n. 11.
[2] The trial judge admonished defendant:

"Mr. Sam. Excuse me. If you had any difficulty with Milton Leday, you can talkyou can say about that but you must not say about Melvin Leday. You understand? You're not to mention that. You can say about Milton. If you had any difficulty with him before, if you had a fight with him before, you can elaborate on that but you must not talk about what happened with you and Melvin."
[3] Alvin Sam testified that the decedent attacked him on the night in question "in a violent way." Also, Lionel Hebert testified that Milton Leday struck defendant with his right hand causing defendant to fall against a railing. Valmond Bellard and Edwin Paul Richard both testified that they knew the decedent and that he had beaten them in the past.