470 So.2d 1013 (1985)
STATE of Louisiana
v.
Cullen DOMINGUE.
No. KA 84 1421.
Court of Appeal of Louisiana, First Circuit.
May 29, 1985.
Rehearing Denied June 27, 1985.
*1014 Aubert D. Talbot, Dist. Atty., Napoleonville, for appellee.
Nathan S. Fisher, Williams & Fisher, Baton Rouge, for defendant-appellant.
Before WATKINS, CRAIN and ALFORD, JJ.
CRAIN, J.
Cullen Domingue was indicted by the Assumption Parish grand jury for first degree murder. He pled not guilty by reason of insanity[1], and elected to proceed by jury trial. On the date the trial was scheduled to begin, the state amended the indictment to charge second degree murder. Defendant pled not guilty to the amended bill. The jury convicted him as charged. Thereafter, defendant moved for a post-verdict judgment of acquittal and for a new trial. Both motions were denied. The trial court sentenced defendant to serve life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence. He has appealed, alleging seventeen assignments of error.
Assignments of error four, nine, ten, eleven, and twelve were not briefed by defendant, and are therefore considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4. Since we find merit in defendant's fourteenth assignment of error, we will forgo discussion of the others.[2]
Defendant was indicted for the murder of O'Neal Crochet, the then current boyfriend of defendant's ex-wife, Brenda Cavalier. Defendant testified that he drove by the house of his former in-laws, where his ex-wife lived, to speak to her. He related that, as he neared the house, he saw the vehicle which belonged to Crochet and decided that he would not stop. As defendant drove past, Crochet shouted an unintelligible remark at defendant. Defendant stopped his vehicle and got out.
From this point testimony differs. Defendant testified that the victim shouted obscenities at him, and came toward him with a fillet knife. Some witnesses who observed the incident from a distance testified that the victim was not armed. In either event, defendant shot and killed the victim from close range. Photographs admitted into evidence show the victim lying on the ground, and a knife approximately ten feet away. The victim was legally intoxicated at the time of death.
*1015 After the shooting, defendant ran into the Cavaliers' home, purportedly to call the police. His former father-in-law attacked and fought him aided by Lillian Gros. Defendant still had the gun, and during the fight, a second shot was fired, which struck and injured defendant's former mother-in-law, Alice Cavalier. Defendant surrendered the gun to Falton Riviere, another witness. He then went to his mother's home and called the police.

ASSIGNMENT OF ERROR NUMBER FOURTEEN
In this assignment of error, defendant argues that the trial court erred when it denied defendant's motion for a mistrial after the state cross-examined defendant on his post-arrest silence, and afterwards argued this silence during closing arguments.
Defendant's primary defense was self-defense. On cross-examination the state repeatedly referred to the fact that defendant had not made a statement regarding his guilt or innocence prior to his testimony at trial although he had been in jail for approximately eight months. The following exchanges took place:
Q. When you were picked up at the very outset, let's say you called, let's say that Leslie Landry went there to get you, you were not injured in anyway, you went to jail, when you were asked to make a statement you gave no statement whatsoever to the law; is that correct?
A. That's correct. My brother had told me before, he said, "Don't make no statements until you talk to a lawyer," and I didn't.
Q. And you didn't?
A. That's correct.
Q. You stayed with this locked in self-defense that you are talking about, you stayed in jail for eight months, you did not report it to the sheriff's office, to the investigators who investigated this thing, you've been in my office before, you know where it is, right back here (indicating), you never called the DA's office or anybody to say, "Listen, ya'll got me on a bum rap"
A. No, sir, but I tried to get in touch with the sheriff, and they told me that Charles Mabile was going to talk to me.
Q. Did you talk to Charles Mabile?
A. Yes, I talked to Charles.
Q. Did you tell him the story you are telling here today?
A. I didn't want to tell nobody nothing because I know how they twist things around. But what I told today, this testimony, that's the truth.
Q. That's the truth?
* * * * * *
Q. When was the first time you talked to Mr. Fisher?
A. About three months after this happened I guess.
Q. But you did not talk with any law enforcement agency about what you are now saying took place because you figured they might twist it around?
* * * * * *
Q. Cullen, is there any other way that you could tell this story betterlet me rephrase that. Could there be any other set of circumstances other than the way you've told it that would better fit your defense, and maybe you're not understanding me, and if you are, answer it.
A. I didn't really understand you. Allthe first part I understand when you said story, and this is not a story
Q. That's why I backed off of that.
A. this is how it actually happened.
Q. That's why I backed off of that. What I am saying is if an attorney, a detective, or anyone else had to think of a set of facts, had to think of a set of facts to make ... self defense.
*1016 Defense counsel objected on the grounds that the question was hypothetical. He later assented to the question, which was reurged. Later the following exchanges occurred:
Q. The questionI can't think of any better way for anything to be self-defense and I'm asking you, can you think of there being any better set of facts than you are telling in order for it to be self-defense?
A. Yes, sir. There is a better fact. If I would have been dumb enough to let him stick me somewhere with the knife, but I couldn't let that happen.
Q. But for you not to get injured and for you to come out, "smelling like a rose" so to speak, this set of facts, can you imagine a better one?
A. Mr. Talbot, I'm just telling you how it happened. I'm just glad that I got out, "smelling like a rose" I didn't get injured, but I don't think it's smelling too much like a rose when you are innocent and you spent seven and a half months in prison.
Q. But you never told, you never told any law enforcement officer that you were innocent; isn't that a fact; you made no statement whatsoever to the law, you refused to make a statement
A. I
Defense counsel ultimately objected as follows:
MR. FISHER: Your Honor, I'm going to object to this. ThisMr. Talbot's been a district attorney here for twenty some odd years, he absolutelyI'm sure he knows what the Fifth Amendment, right against self-incriminationthat's also in thethat's in the United States Constitution and in the Constitution of the State of Louisiana, and he knows very well that accused persons do not have to make statements at all.
MR. TALBOT: Mr. Fisher, of course, is one thousand percent correct
THE COURT: Is that an objection or an argument?
MR. FISHER: Yes.
THE COURT: Okay.
MR. FISHER: Yes, that is an objection to this line of questioning.
MR. TALBOT: Yeah, well, of course, my answer to the objection is he is absolutely one thousand percent correct until the defendant takes the stand and then I can ask him any question I want.
THE COURT: The objection is overruled.
MR. FISHER: To which ruling we assign error.
Q. (BY MR. TALBOT) So, of course, Cullen, you did not make a statement, as a matter of fact, you specifically said, "No statement,"
A. That's correct. I said I didn't want to make any statement.
Q. And at this point in time, some seven or eight months later, you take the stand today and insofar as you know, insofar as you know, this is the first time that any law enforcement agency heard this story coming from you; would that be a correct statement?
A. That's the first time I told what happened to anybody except my lawyer, yes.
* * * * * *
Q. Did you ever call and ask to talk to me, Cullen?
A. No, sir, I never did.
Q. Do you know me?
A. Yes, sir, I know you, but
Q. How long have you been knowing me, Cullen?
A. For a long time, but I didn't think you would talk to me. The sheriff wouldn't talk to me. If I would have known you would have talked to me I guarantee you I would have called you.
On redirect examination, defense counsel attempted to restore defendant's credibility, and questioned defendant on the reasons why he had refused to make a statement during the time he was incarcerated. Defendant specifically stated that he had *1017 been given his Miranda rights, including the right to remain silent.
In Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that a state prosecutor may not seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda warnings at the time of his arrest. The use of a defendant's post-arrest silence in such manner violates due process. In State v. Sam, 412 So.2d 1082, 1084 (La.1982), the Louisiana Supreme Court discussed the ways Doyle had been interpreted in this state, and held that "[a]lthough the defendant can be fully cross-examined when he takes the stand and is subject to impeachment by use of his silence under certain circumstances, it is fundamentally unfair to allow the arrested person's silence to impeach him at trial ...".[3]
Unquestionably, the prosecutor's questions were impermissible references to the fact that defendant invoked his right to post-arrest silence. The question remaining is whether defendant waived his right to object to the questioning by his belated objection.
During trial in State v. Brown, 354 So.2d 516 (La.1978) a defense witness gave an exculpatory version relative to the crime with which both defendant and the witness were charged. The witness was cross-examined as to why this exculpatory version of the incident had not been given to the police at the time of the arrest of both defendant and the witness. The court found that this arguably "constituted an impermissible prosecutorial reference to the witness' post-arrest silence, in derogation of his right to remain silent after police accusation." State v. Brown, 354 So.2d at 517. The court emphasized that the prior opinions had held that an accused may not be so questioned, and, at any rate, that the defense objection, coming after the prosecutor had extensively cross-examined the witness on the subject, was untimely. It was held that "the defendant cannot complain on appeal of the alleged error, to which he did not object until after the witness had already fully answered all of the prosecutor's queries on the subject." State v. Brown, 354 So.2d at 517. In Brown, the references to post-arrest silence stopped after defendant belatedly objected. Defense counsel herein objected after the state had queried defendant in part on his motivation for refusing to make a post-arrest statement. When counsel did ultimately object, he specifically raised the protections guaranteed by the Fifth Amendment to the United States Constitution. After the state advised the court that, on cross-examination, it could question defendant about any subject whatsoever, the court overruled the objection. Extensive questions followed (see colloquy, supra), including insinuations that defendant, with or without his attorney's assistance, had thought up the story he related at trial.
For purposes of this opinion, it is not necessary to determine whether defense counsel waived defendant's right to object to the original line of impermissible questions. Defense counsel objected, the objection was overruled and the impermissible questioning continued. Additionally, the state argued defendant's post-arrest silence extensively in his closing argument, to which a timely objection was lodged. The state argued as follows:
Cullen Domingue did spend eight months in jail and Cullen Domingue does have a constitutional right to remain silent, not to say one word ... He had counsel from a day or so after this happened until his present day in court with Mr. Fisher. Mr. Fisher has been his attorney for at least three or four months now. *1018 He had two other attorneys prior to then. He had attorneys. Why didn't Mr. Domingue come forward then and talk all about this self-defense, etc., and so forth, and give the State an opportunity to do whatever to investigate farther. Never said a word, but he has the right to remain silent, but you have the right to think about why he did.
Defendant took the stand and offered an explanation to explain his conduct. To impeach him by casting doubt on his defense, using his constitutional right to silence to establish an inference that the defense was fabricated, constitutes reversible error under State v. Sam, supra.
The conviction and sentence are reversed and the matter is remanded for a new trial.
REVERSED AND REMANDED.
NOTES
[1] The minute entries do not reflect the dual pleas of not guilty and not guilty by reason of insanity.
[2] In order to assist in retrial of this matter, we will note that assignment of error number 13 relating to use of an alleged prior misdemeanor conviction in order to impeach raises serious questions in the factual context in which it is presented.
[3] The facts in this case indicate much more prejudice than was present in State v. Sam, infra. In that case the questions of the prosecutor could be interpreted as an attempt to elicit information that Sam was given his rights. Here the questions were pointedly directed towards impeaching defendant's present defense of self-defense by questioning his not having previously related that story to officers.