# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-120

STATE OF LOUISIANA

VERSUS

WILLIE JAMES MORRIS, JR.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 267,469
HONORABLE THOMAS M. YEAGER, DISTRICT JUDGE

**********

**MARC T. AMY
JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billie Colombaro Woodard, and Marc T. Amy, Judges.

**AFFIRMED.**

**Thibodeaux, C.J., dissents and assigns written reasons.**

James C. Downs
District Attorney
9th Judicial District Court
701 Murray Street
Alexandria,  LA 71301
(318) 473-6650
COUNSEL FOR APPELLEE:
       State of Louisiana

Thomas R. Willson
Assistant District Attorney
Post Office Drawer 1472
Alexandria,  LA 71309
(318) 473-6650
COUNSEL FOR APPELLEE:
       State of Louisiana

**Paula C. Marx**
**Louisiana Appellate Project**
**Post Office Box 80006**
**Lafayette,   LA 70598-0006**
**(337) 991-9757**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Willie James Morris, Jr.**

**Willie James Morris, Jr.**
**Dixon Correctional Institute**
**Post Office Box 788**
**Jackson,   LA 70748**

AMY, Judge.

The defendant was convicted of second degree battery and was sentenced to a term of three years' imprisonment at hard labor. The defendant appeals his conviction, asserting that certain remarks made by the State during its closing argument violated his Fifth and Fourteenth Amendment rights. For the following reasons, we affirm.

## Factual and Procedural Background

The record reflects that at around 11:30pm on November 22, 2002, members of the Alexandria Police Department responded to an emergency call from the Chevron truck stop at I-49 and Airbase Road. Upon arriving at the scene, officers encountered Carmella Milam, a/k/a/ Kelly Mills (hereinafter "Ms. Mills"), who claimed that the driver of an eighteen-wheeler parked in the parking lot had beaten her. While investigating Ms. Mills' claims, officers came into contact with Willie James Morris, Jr, a delivery driver and the defendant herein, whom they determined was the suspect in the matter.

On January 7, 2003, the defendant was charged by bill of information with attempted second degree murder, a violation of La.R.S. 14:27 and La.R.S. 14:30.1. The defendant subsequently waived formal arraignment and pled not guilty on January 17, 2003. On August 12, 2003, the bill of information was amended to charge the defendant with second degree battery, a violation of La.R.S. 14:34.1,[1] and the matter

---

[1]Louisiana Revised Statute 14:34.1 provides as follows:

Second degree battery is a battery committed without the consent of the victim when the offender intentionally inflicts serious bodily injury.

For purposes of this article, serious bodily injury means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.

Whoever commits the crime of second degree battery shall be fined not more than two thousand dollars or imprisoned, with or without hard labor, for not more than five years, or both.

proceeded to trial by jury.

At trial, Ms. Mills testified that she became acquainted with the defendant at a truck stop in Dallas, Texas, on or about November 21, 2002. She explained that the defendant shared some barbeque with her and that they talked for several hours before the defendant mentioned that he was going back to Rapides Parish, Louisiana, for a week off. Ms. Mills stated that she decided to accompany him. She testified that during the trip, she and the defendant drank alcoholic beverages and used crack cocaine.

Ms. Mills stated that when they arrived in Alexandria, the defendant got out of the truck, and it was her understanding that he was going to go reserve a room for them at a motel. However, she testified, when the defendant returned, they did not go to a motel; instead, they remained in the defendant's truck. According to Ms. Mills' testimony, at this time, the defendant began to give her orders. She indicated when she did not react well to these commands, the defendant began beating her. Ms. Mills stated that after the initial round of beatings, the defendant requested sex, which she refused. She recalled that the defendant continued to beat her for several hours, repeatedly telling her that he was going to throw her into a bayou, and she indicated that she eventually lost consciousness after being choked. She stated that she tried to leave at one point, but the defendant knocked her back down. Ms. Mills explained that she knew that the defendant had not had much rest during the trip and had been drinking steadily, and she decided to wait until he passed out to get help. Ms. Mills testified that when the defendant passed out at the Chevron truck stop, she went inside to ask for help, and a man called the police on his cell phone.

Ms. Mills indicated that as a result of being beaten, she sustained cuts all over her face, a collapsed lung, bruises on her neck, cracked ribs, and blurred vision. The record also indicates that she underwent surgery, wherein a tear duct was inserted into her right eye. Ms. Mills further testified that as of the time of trial, she was still being treated for post-traumatic stress disorder and major depression.

Detective Wesley Mathews of the Alexandria Police Department testified that when he arrived at the scene, Ms. Mills was already in an ambulance. Detective Mathews indicated that an officer informed him that the suspect in the matter, the defendant herein, was in his truck in the parking lot. According to Detective Mathews' testimony, he and the officer eventually established contact with the defendant, who had apparently been sleeping. Detective Mathews testified that he advised the defendant of his *Miranda* rights and asked to look inside the truck. He stated that after the defendant gave permission, he recalled that he saw blood spattered on the walls of the truck's sleeper area. Accordingly, he called the crime scene division. Detective Mathews indicated that there were no witnesses to the beatings and that the investigation was based on the victim's account of what had happened.

The defendant testified on his own behalf at trial, explaining that he had, in fact, hit Ms. Mills, but he did so in self defense. The defendant indicated that it was his understanding that Ms. Mills was a prostitute, and he claimed that although he paid Ms. Mills $10 for oral sex once during the trip, she had performed oral sex on him a second time without charging an additional fee. The defendant stated that, while parked at the Chevron in Alexandria, he noticed that his wallet was not in its usual location in the truck, and, when he opened it, he found that it was empty. As a result, the defendant concluded that Ms. Mills had stolen money from him during the trip,

3

and he confronted her and asked to search her clothes. According to the defendant, Ms. Mills gave him her clothes to search and, while he was looking through them, she brandished a screwdriver and "kind of slashed" at him, threatened him, and then "slashed" at him as if to stab him. The defendant further testified that Ms. Mills bit him when he tried to take the screwdriver away from her, so he "punched her several times to make her . . . stop biting [him]" and "punched her to give [him] the screwdriver also." The defendant denied knowledge of what was on the walls of the sleeper compartment and denied using drugs.

The record indicates that the State inquired about the screwdriver in its cross-examination of the defendant as follows:

> Q [by the prosecuting attorney].   Where is the screwdriver at now?
> A [by the defendant].   I don't know, it was in that truck somewhere.
> Q.   And your lawyer had Detective Bates on the stand for a long, long time, did anybody ever ask him about a screwdriver, did you hear anybody talk about a screwdriver, did you?
> A.   I read it in the . . .
> Q.   You read it?
> A.   . . . statement, yes, sir.
> Q.   But nobody asked him a question? From this witness stand, that where the evidence comes from you heard all this when we started – [sic]
> A.   Uh-huh.
> Q.   Nobody asked him about a screwdriver, did they?
> A.   No.

On August 13, 2003, a unanimous jury rendered a verdict finding the defendant guilty of second degree battery in violation of La.R.S. 14:34.1. On August 22, 2003, the first of a series of arguments was held regarding the defendant's motion for post-verdict judgment of acquittal or new trial, based on certain comments made by the State during its closing argument. On September 22, 2003, the trial court denied the defendant's motions and sentenced him to serve three years at hard labor with credit

4

for time served.  The defendant subsequently filed a motion to reconsider, which the trial court denied.  On September 23, 2003, the defendant filed a notice of appeal.

The defendant asserts, in his sole assignment of error, that after the State used his post-arrest silence to impeach his credibility during its closing arguments, the trial court mistakenly denied his requests to admonish the jury or, in the alternative, to grant a new trial, based on the defendant's allegations that his Fifth and Fourteenth Amendment rights were violated.

## Discussion

*Errors Patent*

Pursuant to La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record.  We find no such errors.

*Alleged Violation of the Defendant's Fifth and Fourteenth Amendment Rights*

The defendant's sole argument on appeal is that the State referred to his post-arrest silence in an attempt to impeach his credibility during its closing argument, thereby violating his Fifth and Fourteenth Amendment rights.  The defendant argues that the trial court erred in denying his motion to admonish the jury and in denying his request for a new trial on this basis.

The defendant's contentions herein are based upon the following remarks that appeared in the State's rebuttal closing argument at trial:

> But if you do believe that story about the screwdriver, the one that he didn't tell the police, don't you know if Detective Bates had heard anything about a screwdriver he'd have looked for one?  I'd submit to you the screwdriver just appeared today.  It sure wasn't there that day.
> The one about the bite marks that he didn't tell the jail?  I'm going to tell you the bite marks showed today.  They weren't there that day.  But if you do believe all that, and I don't know how you can, but if you do, question is that reasonable. . . .  I don't care if she had a gun, that ain't reasonable.  He could have took it away from her.  And I'm going to tell you it never existed.  It would have showed up today.  Because if it existed he would have said, hey why are you taking me to jail.  She

5

attacked me. Let me show you the screwdriver.

At this time, defense counsel objected, contending that the State Mirandized his client, that his client had the right to refrain from making a statement, and that the State was now "implying" that his client should have given a statement, thereby infringing upon his rights. Defense counsel asked the trial judge to admonish the jury accordingly. The prosecuting attorney countered, opining that the statement was a "reasonable inference from the evidence," not a "comment on [the defendant's] assertion of rights." The trial judge overruled defense counsel's objection.

After the defendant was convicted, his attorney filed a motion for post-verdict judgment of acquittal and/or new trial, again raising the issue as to whether the State had properly mentioned the defendant's post-arrest silence in its closing remarks. The court denied the motion, finding that the defendant's rights had not been violated.

The circumstances in which admonition of a jury is appropriate are described in La.Code Crim.P. art. 771, which provides:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

In addition, the criteria for a mistrial are set forth in La.Code Crim.P. art. 770, as follows:

> Upon motion of a defendant, a mistrial shall be ordered when a

6

remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;

(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

(3) The failure of the defendant to testify in his own defense; or

(4) The refusal of the judge to direct a verdict.

An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

The leading case addressing the impact upon a defendant's rights by a State's reference to the defendant's silence is *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240 (1976). In *Doyle*, the defendants were charged with selling marijuana. Separate trials were held, and in both cases, the defendants claimed that they were framed. In an attempt to impeach the defendants' credibility on cross-examination, the prosecutor inquired of each defendant why they had not informed the arresting officer of this defense. The defendants appealed, contesting the State's use of their silence to impeach their credibility at trial. The matter proceeded to the United States Supreme Court, who held as follows:

Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan v. Tucker*, 417 U.S. 433, 443-444, 94 S.Ct. 2357, 2363-2364, 41 L.Ed.2d 182 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States v. Hale*, *supra*, 422 U.S. [171], at 177, 95 S.Ct. [2133], at 2137. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair

and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in *United States v. Hale, supra* [422 U.S.], at 182-183, 95 S.Ct., at 2319, put it very well:

> "[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony. . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case."

> We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. . . .

*Doyle*, 426 U.S. at 617-19, 96 S.Ct. at 2244-45 (footnotes omitted).

In *State v. Bell*, 446 So.2d 1191 (La.1984), the Louisiana Supreme Court underscored the following footnote appearing in *Doyle*:

> It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest. Cf. *United States v. Fairchild*, 505 F.2d 1378, (CA5 1975).

*Bell*, 446 So.2d at 1192 (quoting *Doyle*, 426 U.S. at 619, n.11, 96 S.Ct. at 2245, n. 11).

The court further observed in its opinion in *Bell* that, in *State v. Sam*, 412 So.2d 1082 (La.1982), a matter in which the State was persistent in cross-examining a defendant regarding his failure to offer an exculpatory explanation at the time of his arrest, the defendant's conviction was reversed in reliance upon *Doyle*. Nonetheless, the court pointed out,

> In *Sam*, however, we noted the *Doyle* Court's recognition that, under certain circumstances, a reference by the prosecutor to a defendant's

post-arrest silence is permissible. 412 So.2d at 1084, n. 1, quoting *Doyle*, 426 U.S. [at] 619, n. 11, 96 S.Ct. [at] 2245, n. 11 and citing *United States v. Fairchild*.

. . . .

Thus we see that the *Doyle* proscription against referring to a defendant's post-arrest silence is not without exceptions. *Doyle* itself stated that a defendant's earlier silence may be shown to rebut a defense contention that the defendant had given an exculpatory story to the police after his arrest. In *Fairchild*, a defendant's post-arrest silence was admissible to rebut a contention of active cooperation with the police when in fact the defendant had invoked his Fifth Amendment rights.

Additionally we have refused to reverse a conviction because a prosecutor referred to the defendant's failure to sign the rights form in order to counter suggestions that the defendant's attitude at the time of his arrest was one of nonchalance. *State v. Brown*, 395 So.2d 1301 (La.1981).

*State v. Bell*, 446 So.2d at 1192-93 (footnote omitted). The supreme court concluded that the State's reference to the defendant's post-arrest silence was neither a violation of his Fifth Amendment rights, fundamentally unfair, nor a deprivation of his Fourteenth Amendment due process rights, stating that:

In this case since defense counsel suggested to the jury that the state had failed to investigate the matter, and implied that, had it been investigated properly, the forgery charges would not have been brought against the defendant, the state was allowed to respond by asking the defendant and the investigating officers whether or not they tried to determine the defendant's involvement by questioning him at the time of his arrest. The defendant may not tell the jury that the state's case is the result of improper investigation without allowing the state to try to show the jury that the investigation was indeed thorough, or at least sufficiently thorough as to include inquiries of the defendant in order to get leads which might verify, or dispute, defendant's noninvolvement.

*Id.* at 1194.

In the present appeal, the State contends that in its closing arguments at trial, it remarked that upon the defendant's initial encounter with police, he should have told them that Ms. Mills had threatened him with a screwdriver. At this point in the investigation, the State insists, the defendant had not yet been read his *Miranda* rights, and the police were simply looking into a complaint. The State further argues that when the defendant did not offer an explanation as to what had happened, he was arrested. As such, the State argues that it referred to the defendant's pre-arrest silence in its closing argument and, pursuant to *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124 (1980), its use of the defendant's pre-arrest silence to impeach his credibility was not improper.[2]

In the alternative, the State argues that if police immediately placed the defendant under arrest, the prosecutor's brief reference to the defendant's post-arrest silence did not require a mistrial or a reversal on appeal because in general, the trial was conducted fairly, and there was strong evidence of the defendant's guilt, citing *State v. Ledesma*, 01-1413 (La.App. 5 Cir. 4/30/02), 817 So.2d 390. In addition, the State claims that, pursuant to *State v. Marcotte*, 01-1586 (La.App. 3 Cir. 5/15/02), 817 So.2d 1245, *writ denied*, 02-1687 (La. 2/7/03), 836 So.2d 96, the defendant cannot contest the State's comments in this regard because the defendant questioned the thoroughness of the police investigation.

In the present matter, the defendant argues that the State's remarks in its closing arguments were not "an oblique reference" to the defendant's post-arrest silence but were, instead, a direct attempt to impeach the defendant's credibility. The defendant contends that none of the exceptions to the United States Supreme Court's decision

---

[2]In *Jenkins*, the United States Supreme Court held that the use of a defendant's pre-arrest silence does not violate his or her Fifth or Fourteenth Amendment rights.

in *Doyle*, as listed in *Bell*, above, are relevant in the matter at hand.    Our review of the matter on appeal first requires a determination as to whether the State's closing remarks referred to the defendant's pre-arrest or post-arrest silence.   The record reflects that Detective Wesley Mathews testified on behalf of the State and described his initial contact with the defendant as follows:

> A [by Detective Mathews].    Myself and Officer Tigner went to make contact with the suspect.  We banged on the door for a while.  Finally he woke up and he came outside.  Officer Tigner patted him down for weapons.  He had a small knife in his pocket.  I advised him of his rights per <u>Miranda</u>.  I asked him if I could look in his truck.  He said sure, that was fine.
>
> Q [by the prosecutor].    Did you start looking at the truck?
> A.    Yes.
> Q.    And what did you see?
> A.    When I stepped up into the truck, in the sleeper part, I saw blood spattered against all the walls in the sleeper part of the truck.
> Q.    And what did you do at that point?
> A.    At that time, I stepped down to make contact.
> Q.    Why would you do that?
> A.    I wanted –
> Q.    Why didn't you investigate further?
> A.    I wanted to get a signed consent for permission to search.
> . . . .
> A.    Yes, I – at first, I went to make contact with Mr. Morris and asked him to sign a permission to search which we used.  And at the time I called Detective Bates.
> . . . .
> Q.    What did you do after that, did you stay at the scene?
> A.    I stayed at the scene – well, after I called Bates we put Mr. Morris in handcuffs in back of Tigner's unit.  Officer Tigner transported him to headquarters and released him to Detective Howard.  I stayed at the scene until Detective Bates arrived.

The Alexandria Police Department's initial encounter with the defendant was further explained upon defense counsel's cross-examination of Detective Mathews, in which the following colloquy occurred:

11

A [by Detective Mathews].  After going back to the station, I tried to speak with Mr. Morris and he wanted his lawyer so we took him to the parish jail.

Q [by counsel for the defendant].  Okay.  And in reference to that, when you asked him if he – if he could – you could search his vehicle, you advised him of his rights, is that right?

A. Right.

Q. When I talk about rights, we're talking about Constitutional rights, is that correct?

A. Rights per <u>Miranda</u>.

Q. Right, constitutional rights and one of those rights is that he doesn't have to let you search without a search warrant, is that correct?

A. Correct.

Q. And when he didn't give you a statement and he asked for a lawyer, that's one of those constitutional rights, isn't it?

A. Right.

Detective Mathews' testimony does not indicate that the defendant was informed as to the reasons why he was given his *Miranda* rights or why the police wished to search his truck.  The relevant testimony merely indicates that upon looking inside the defendant's truck, Detective Mathews asked the defendant for written permission to search, and the defendant was then handcuffed and put into a police car.  Based upon our examination of the record, it does not appear that the defendant was given an opportunity to explain what occurred, and it seems that the events prior to the defendant's being placed in handcuffs occurred within a short period of time of the defendant's initial contact with police.  Accordingly, we find that the State's closing argument referred to the defendant's post-arrest silence.

Furthermore, we find that the closing remarks at issue herein were not, as the State contends, "a brief reference" to the defendant's post-arrest silence as contemplated by *Ledesma*, cited by the State in support of this position.  In that case, the defendant was charged with possession of crack cocaine.  At trial, while questioning a police officer regarding the sequence of events occurring from the time of the initial complaint in the matter through the time of arrest and the defendant's

delivery to police headquarters, the State asked if the defendant had explained why he was in possession of the crack cocaine. The police officer responded that the defendant had not. In its review of the matter on appeal, the fifth circuit determined that the State's reference to the defendant's post-arrest silence was indirect. The circumstances of *Ledesma* are distinguishable from those of the instant matter. In its closing remarks in the instant matter, the State directly referred to the defendant's post-arrest silence in an effort to impeach the defendant's credibility. Accordingly, these remarks are improper unless they meet one of the exceptions to the general rule of *Doyle*, as set forth by the Louisiana Supreme Court in *Bell*, above.

The State and the defendant likewise offer conflicting interpretations of *Marcotte*, cited above, in support of their respective arguments on appeal. In *Marcotte*, the defendant was convicted of attempted distribution or dispensation of a controlled dangerous substance to a person under the age of eighteen, the defendant's son. In defense counsel's opening statement, he argued that there was insufficient evidence to convict and implied that the State had filed charges against the defendant solely on the defendant's son's allegations. In his defense, the defendant claimed that he had an alibi. He testified that he and had driven to a lodge with his son, who remained outside the lounge with friends while the defendant went inside. The defendant claimed that at one point, when he went outside to check on his son, he was not there. When the defendant looked for his son a while later, he had reappeared and was extremely intoxicated. In keeping with the alibi defense, defense counsel examined detectives about the extent of their investigation and inquired as to the detectives' efforts to locate and to interview other witnesses. The defendant was convicted, and he subsequently appealed, complaining that the State's cross-examination violated his constitutional rights. A panel of this court affirmed the

defendant's conviction, concluding that "[a]lthough the defendant's attack on the State's investigation was not as explicit as that in Bell, the defendant 'opened the door' to questions about his post-arrest silence[,]" and further commenting that:

> [o]nce a defendant raises questions regarding an investigation's thoroughness during trial, it is a theme he may well be expected to revisit during his closing argument to the jury. Thus, the State has a legitimate purpose in asking questions about a "defendant's opportunity to explain what happened." [*Bell*, 446 So.2d at 1194].

*Marcotte*, 817 So.2d at 1251-52.

The defendant argues that *Marcotte*, cited by the State in support of the trial court's ruling, is distinguishable from the matter *sub judice*. The defendant observes that in *Marcotte*, the defendant raised an alibi defense that required notice to prosecutors pursuant to La.Code Crim.P. art. 727. The defendant points out that alibi is not an issue in the instant appeal. In addition, the defendant argues that due to the alibi and misidentification claims asserted by the defendant in *Marcotte*, the investigation preceding his arrest was thoroughly questioned. Accordingly, the defendant argues, the *Marcotte* decision intended the exceptions to *Doyle* regarding post-arrest silence to apply only to those limited facts. We disagree.

In *Marcotte*, as well as in the instant matter on appeal, the defendant contended that there was insufficient evidence for a conviction and implied that the State had filed charges automatically, based on the victim's allegations. The following passage from the supreme court's opinion in *Bell* was relied upon by the deciding panel in *Marcotte* and is also persuasive in the instant matter on appeal:

> The case we review here is another situation in which it can be fairly said that the defendant invited the state's inquiry into what happened in the early stages of the investigation. The state had a legitimate purpose in questioning the defendant and the investigating officer about the defendant's arrest and defendant's opportunity to explain what had happened. That was to rebut a defense contention that the prosecutor had failed to investigate the matter thoroughly before

14

bringing charges against the defendant. Only coincidentally was there at the same time a prejudicial effect upon the defendant when this exploration also pointed up his post-arrest silence. The defendant himself broached the subject of a lack of investigation, which prompted the state's attempt at refutation. The incidental consequence was that the defense lowered the bar and "discarded the [Fifth Amendment] shield which the law had created to protect him." [*U.S. v. Fairchild,*] 505 F.2d 1383.

*Bell*, 446 So.2d at 1193-94.

The record clearly reflects that the defendant repeatedly attacked the thoroughness of the police investigation in the instant matter, particularly during cross-examination of Detective William Bates, who conducted the crime-scene investigation. The following colloquy is representative of the defense's inquiry into the extent of the investigation herein:

> Q [by counsel for the defendant]. You . . . did not have that blood analyzed, is that correct, in any way, shape or form?
> A [by Detective Bates]. No, sir.
> Q. You don't know whether it's human blood even, is that correct?
> A. No, sir.
> Q. Okay. And you did not have any DNA performed on it so you can't say with any kind of certainty that it's Kelly Mills/Milam, is that correct?
> A. It's her blood?
> Q. Right. You didn't do any DNA so you can't say that it's her blood.
> A. No DNA testing saying it's her blood, no, sir.
> Q. Okay. So the only person who really is saying that whatever – if there is human blood in there, it's Kelly Mills/Milam, is that right?
> A. Kelly saying that she was beaten in the truck, yes, sir.
> Q. Right. So it's all her. I mean you didn't do any analysis to make a determination of whether it was actually her, that's correct?
> A. Right.
>      . . . .
> Q. So all of which you purport – excuse me – purport to being blood stains, we have no scientific evidence that they are in fact human blood and that they were – belonged to Kelly Mills. So, or for that matter, that they belong to Willie Morris, is that correct?
> A. That's correct.

15

Upon further cross-examination, Detective Bates admitted that he did not take into evidence a pair of jeans found inside the defendant's truck and did not test the stains found on the jeans to determine whether they were blood. Moreover, Detective Bates stated that he did not analyze swabs taken from the interior of the defendant's truck, did not analyze stains on the defendant's clothing, did not fingerprint the interior of the defendant's truck, and did not take into evidence a maroon jumpsuit with a pair of panties found in the defendant's truck.

Defense counsel commented upon the police investigation in the matter in his closing argument as follows:

> That . . . very well may be blood, but we don't know that. What did [Detective Bates] say? Did he have it analyzed? No. Did he know that it was human blood? No. Did he do anything to identify this as blood? No. Where did [Detective Bates] get that information from? He got it from Kelly Mills/Carmella Milam that – that these pictures he took of – of the things inside the truck.
> . . . .
> The screwdriver and the pipe, did Detective Bates take any evidence in this case except what somebody else collected and these photographs and those – those cards? I mean he didn't take – there was a blue jean jacket there's a picture of that's supposed to have blood on it which was not analyzed. And that was not taken into evidence. So if it didn't . . . have blood on it, he didn't take it as evidence.

As explained above, when a defendant attacks the thoroughness of a police investigation, pursuant to *Bell*, the usual prohibition against the State referring to the defendant's post-arrest silence is not in effect. We conclude that in the present matter, when defense counsel attacked the thoroughness of the police investigation, he "opened the door" regarding the defendant's post-arrest silence. Consequently, the State's closing remarks with respect to the defendant's post-arrest silence were not inappropriate. Accordingly, the trial court did not err in denying the defendant's request for an admonishment and for a new trial following the State's remarks at issue herein. This assignment lacks merit.

16

## DECREE

For the foregoing reasons, the conviction of the defendant, Willie James Morris, Jr., is affirmed.

**AFFIRMED.**

STATE OF LOUISIANA

VERSUS

WILLIE JAMES MORRIS, JR.


THIBODEAUX, C.J., dissenting.


*Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240 (1976) prohibits the use of an accused's post-arrest silence. Any reference to an accused's post-arrest silence is legally impermissible. The use of such reference in cross examination of the defendant or in the state's closing argument emasculates the right to remain silent, as guaranteed by the Fifth and Fourth Amendments to the United States Constitution and by Article 1, § 13 of the Louisiana Constitution.

In many, if not most criminal cases, the fairness of the police investigation is almost always attacked. The use of such a legitimate tactic is extremely limited if, by doing so, the state's inquiry into an accused's post-arrest silence is invited. Such a deterrent on the presentation of the defendant's case raises serious questions with regard to the right to effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and by Article 1, § 13 of the Louisiana Constitution. It is incongruous for one to forfeit a constitutional right because other constitutional rights have been exercised or because the strength of the state's case is attacked.

At the very least, the trial court should have admonished the jury in accordance with La.Code Crim.P. arts. 770 and 771.

For the foregoing reasons, I respectfully dissent. I would reverse the defendant's conviction and remand to the trial court for a new trial.