# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 13-1162


STATE OF LOUISIANA

VERSUS

**TED DWAYNE STEVENS, JR.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR-132400
HONORABLE KRISTIAN D. EARLES, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## JIMMIE C. PETERS
## JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Jimmie C. Peters, and Billy Howard Ezell, Judges.


**AFFIRMED.**


**James E. Boren**
**830 Main Street**
**Baton Rouge, LA 70802**
**(225) 387-5786**
**COUNSEL FOR DEFENDANT/APPELLANT:**
  **Ted Dwayne Stevens, Jr.**

**Rachel I. Conner**
**3015 Magazine Street**
**New Orleans, LA 70115**
**(504) 581-9083**
**COUNSEL FOR DEFENDANT/APPELLANT:**
  **Ted Dwayne Stevens, Jr.**

**Michael Harson**
**District Attorney**
**James N. Prather, Jr.**
**Assistant District Attorney**
**Fifteenth Judicial District**
**P.O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
   **State of Louisiana**

**PETERS, J.**

A Lafayette Parish jury convicted the defendant, Ted Dwayne Stevens, Jr., of aggravated rape, a violation of La.R.S. 14:42, and second degree sexual battery, a violation of La.R.S. 14:43.2. Thereafter, the trial court sentenced the defendant to serve life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence on the aggravated rape conviction; and to serve a concurrent fifteen-year sentence at hard labor on the second degree sexual-battery conviction. The defendant has appealed his convictions, asserting seven assignments of error. For the following reasons, we affirm the convictions in all respects.

DISCUSSION OF THE RECORD

The victim in this criminal proceeding is the wife of the defendant.[1] On the morning of December 18, 2010, she and the defendant traveled in their dual-cab Silverado Chevrolet truck with two of their three children to Lafayette, Louisiana, to attend the wedding of her niece. They checked into the Lafayette Staybridge Suites Hotel, where a number of the wedding guests were staying, and then attended the wedding and the subsequent reception.

The reception was held at Abacus, a banquet and reception facility rented for the occasion, and the alcohol flowed freely during the evening. The defendant and L.S. left the reception late in the evening,[2] and, at the time, L.S. was significantly intoxicated.

When they arrived at the hotel, the defendant parked in a remote area of the parking lot and initiated a physical/sexual encounter with his wife in the truck. The immediate result of this encounter was that L.S. began bleeding profusely.

---

[1] Pursuant to the mandate of La.R.S. 46:1844(W)(1)(a), she will be referred to by the initials "L.S." throughout this opinion.

[2] The two children had returned to the hotel with other relatives earlier in the evening.

She lost consciousness, became unresponsive, and her physical condition rapidly deteriorated. A 911 call was placed, after which she was transported by ambulance to Lafayette General Hospital (Lafayette General).

When L.S. arrived at the Lafayette General Emergency Room in the early morning hours of December 19, 2010, she was initially in no condition to provide any information to the medical personnel, and no one accompanying her provided a history upon which to establish a baseline for diagnosis and treatment. The medical personnel performed a head-to-toe examination and, in doing so, discovered the source of her bleeding to be a severe tearing-type injury in the area of her rectum. Monique Cohen, the duty nurse assisting in the examination, suggested that she had never before witnessed a patient with this "degree of tearing around the rectum" and that both the anus and vagina appeared to have significant tearing. Ms. Cohen also observed that L.S. had multiple areas of abrasions, including abrasions on both knees, her lower back, and her posterior arms. With regard to these abrasions, she suggested that "[i]t's like she had fallen on her knees or had been pushed down or held down."

The emergency room physician quickly concluded that the damage suffered by L.S. would require corrective surgery, and Dr. David Barrios, a Lafayette, Louisiana general surgeon, was called in to assist in the evaluation and treatment process. Dr. Barrios first examined L.S. in her hospital room at approximately 6:00 a.m. on December 19, 2010. Because of L.S.'s pain level, Dr. Barrios could not complete his examination in the hospital room, so he simply moved his patient into the operating room.

Upon further examining L.S., Dr. Barrios observed a significant amount of blood and torn tissue in the perineum.[3] In attempting to explain the degree of damage he observed, the doctor suggested that while he had seen many severe situations during his career, when he first saw the damage to L.S., he had to sit down because he actually became "weak." Dr. Barrios then inserted a camera past the perineum for a laparoscopic view of the intestines, but found no obvious holes. However, he did observe bruising of the internal structures approximately eight to ten inches down into the pelvis. He closed the obvious holes in the abdomen and refocused his efforts on the perineum injuries.

In doing so, Dr. Barrios found a very deep laceration through the anal sphincter[4] and noticed that the muscles were completely torn in that area. He described these lacerations as being six to seven centimeters in size and agreed that the injuries effectively destroyed L.S.'s anus. Further examination revealed two additional small lacerations further in the anal canal. Dr. Barrios washed these internal lacerations and closed them with sutures.

L.S. remained in the hospital under Dr. Barrios' care, and, when the sutures began to dissolve, it became apparent to the doctor that her wounds were not going to heal properly. Dr. Barrios then performed an additional surgery creating a diverting colostomy. He explained that without proper healing of the injured area, every bowel movement would flood the injured area with bacteria and create a continuous infection problem. This surgery took place on December 29, 2010. Sometime later in his treatment of L.S., Dr. Barrios recommended that she seek additional medical help from a specialist in the area of anal/rectal care.

---

[3] Dr. Barrios described the perineum as the area between the vagina and the anus.

[4] Dr. Barrios suggested that the anal sphincter helps to control bowel movements.

3

When L.S. returned to Texas, she followed Dr. Barrios' advice and ultimately came under the care of Dr. Rayloff Bailey, whom she described as a nationally known specialist in anal/rectal surgery. She testified that shortly before trial, Dr. Bailey performed a form of plastic surgery in an effort to eliminate her need for the colostomy bag, which was unsuccessful. At the time of trial, she still was connected to the colostomy bag, and she described what appears to be her lifetime situation as having her rectum hanging out of her intestines.

Officers of the Lafayette Police Department performed an initial investigation in the early morning hours of December 19, 2010, and this investigation resulted in the defendant's arrest. On February 9, 2011, a Lafayette Parish Grand Jury indicted the defendant for both aggravated rape and second degree sexual battery. A jury trial began on July 16, 2012, and the jury ultimately returned guilty verdicts on both counts. After the trial court sentenced the defendant, he perfected this appeal, asserting seven assignments of error.

## OPINION

The jury convicted the defendant of aggravated rape, a violation of La.R.S. 14:42, and second degree sexual battery, a violation of La.R.S. 14:43.2. As it applies to this case, La.R.S. 14:42(A) provides that:

> Aggravated rape is a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim resists the act to the utmost, but whose resistance is overcome be force.

With regard to the offense of second degree sexual battery, La.R.S. 14:43.2 provides in pertinent part that:

> A. Second degree sexual battery is the intentional engaging in any of the following acts with another person when the offender intentionally inflicts serious bodily injury on the victim:

4

(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender[.]

. . . .

B. For purposes of this Section, serious bodily injury means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty or a substantial risk of death.

The defendant asserts on appeal that no rape occurred. However, with regard to the sexual-battery conviction, he does not dispute the fact that L.S. sustained her injuries while he was engaged in an act described in La.R.S. 14:43.2(A)(1).

Six of the seven assignments of error address procedural or evidentiary issues, which the defendant asserts affected the ultimate outcome of the trial. Only in the third assignment of error does the defendant challenge the sufficiency of the evidence presented by the state and then only as to the aggravated-rape conviction. Because a finding of merit in an assignment of error addressing the sufficiency of evidence will normally preclude the necessity of considering the remaining assignments of error pertaining to that offense, we will consider the third assignment of error first. *State v. Hearold*, 603 So.2d 731 (La.1992).

### Assignment of Error Number Three

The well-settled standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). This standard, generally referred to as the *Jackson* standard, is now legislatively embodied in La.Code Crim.P. art. 821. It does not

5

allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, p. 4 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 727).

The defendant bases his argument in this assignment of error on two assertions: (1) that there exists no evidence of penile penetration, and (2) that L.S. was too intoxicated to resist to the utmost.

At trial, L.S. testified that her husband forced drinks on her at the reception and, by the time she left Abacus, she was highly intoxicated.[5] After being placed in the truck, she passed out and, when she regained consciousness, the next thing she was aware of was that she was sitting in the front seat of the truck with her husband, who was in front of her, pulling down her underwear. She described what happened next with the following testimony:

> I remember being in the car, the truck, and he's just in front of me, and he's pulling my underwear down. And I said, "What are you doing? What are you doing?" And then the next thing I know he starts shoving something inside me. And I'm horrified looking down, and his hand is going up to where I couldn't -- I could just see to his wrist, I couldn't see his hand or anything. And I started screaming, "Stop! Stop!" You know, hollering hysterically, "Stop!" And I was

---

[5] This testimony was supported by the testimony of Tassie Flessas, a Spring, Texas resident, and Kenneth Boyles, Jr., a Youngsville, Louisiana resident. Both men attended the reception and testified that they observed the defendant pushing drinks toward L.S. Mr. Flessas described himself as an acquaintance of L.S., and Mr. Boyles, Jr. is her nephew. Mr. Boyles, Jr. also testified that he assisted the intoxicated L.S. into her vehicle when she and the defendant left Abacus.

screaming. And I took my feet and tried to scramble back but I was against the seat so I was looking down. I could see to his wrist at that point, and I was trying to push my hands back, but then he grabbed my hands and held them back against the seat. That's when he hit my nose. And he held them against the seat, and then I just remember I couldn't look forward to actually see when he put his penis inside. I never saw a penis, but I just saw his hands back here, and his body then going, moving. I was so torn up. I don't know which private he was in because I just hurt so bad, but I could see his body, just the lower half moving.

When later questioned concerning the defendant penetrating her with his penis, she responded, "I do not know which one he put it in. I do know he penetrated me. I could see his body penetrating me. At that time I could not feel. I didn't have an anus or vagina anymore. It was almost like one piece. I was ripped up, sir." With regard to her resisting her husband's attack, L.S. testified at one point, "I never had consensual sex with him, sir. I fought him, I fought him, I screamed at the top of my lungs. I had my feet on him. I had my hands on him until he grabbed my hands and pinned them down, I had my back on the seat." She also stated that in her past sexual experience with her husband, he was normally unable to achieve an organism unless he hurt her in some way.

According to L.S., as the defendant's attack on her continued, she fell in and out of consciousness. She recalled him telling her at one point to get out of the truck and, when she failed to immediately respond, he grabbed her hair and she simply collapsed. Her next recollection was waking up in the hospital and telling the defendant to leave the room.

The defendant's version of what occurred on that evening is decidedly different from that of L.S. According to the defendant, he did not force alcoholic drinks on her and, although Mr. Boyles, Jr. did assist in getting L.S. into the truck, she was not nearly as intoxicated as she suggested. In fact, according to the

7

defendant, he talked to her during the drive to the hotel and she responded to his attempted conversation.

He testified that after he parked the truck in the hotel parking lot, he exited the truck on the driver's side[6] and opened the passenger door to help her out. According to the defendant, when he opened the door, he was met by his wife, who began kissing and touching him. He responded and, as they continued to kiss and touch each other, L.S. pulled up her dress, removed her underwear, and spread her legs apart, placing one leg on the door's window frame and the other on the rear door frame. He immediately placed two fingers inside of her anus and began to masturbate himself with his other hand.

According to the defendant, it was only after he had ejaculated that he realized something was wrong because he noticed some blood on his hand. Using some paper towels, he attempted to clean L.S. while at the same time helping her with her dress. He then moved the truck closer to the hotel entrance and opened the passenger door for L.S. The defendant testified that despite having reached a sexual climax, at no time did he place his penis in L.S.'s vagina or anus. By this time, L.S. had lost consciousness again and was lying outside the truck on the hotel parking lot.

The evidence concerning what occurred next is also in conflict. Kenneth Boyles, L.S.'s father, testified that after leaving the reception and returning to the hotel at approximately 10:00 p.m., he received a telephone call from the defendant sometime after midnight, asking him to meet him in the hotel lobby. When Mr. Boyles arrived in the lobby, the defendant told him that L.S. had passed out and was lying in the hotel parking lot.

---

[6] L.S. testified that he moved directly from the driver's seat to the passenger seat without exiting the vehicle.

8

When he got to his daughter, Mr. Boyles said that she was lying on her back next to the family vehicle, bleeding from the nose, and he could not tell whether she was dead or alive. At about the same time, Chris Morris and his sister[7] walked up. According to Mr. Boyles, when Mr. Morris asked what had happened to L.S., the defendant told him that L.S. had passed out drunk and added that this happened often. Mr. Morris, who is a trained paramedic, checked L.S.'s vital signs and found her to have a very weak pulse. He further noted that she was unconscious, unresponsive, clammy to the touch, and very pale in color. He immediately concluded that she was in serious distress and gave his cellular telephone to his sister, instructing her to call 911.

Mr. Morris testified that he and Mr. Boyles then carried L.S. to her room in the hotel and laid her on the bed. At this point, Mr. Morris realized for the first time that L.S.'s clothes were soaked with blood. He also noticed that some of that blood had transferred to his shirt as he carried L.S. from the parking lot.

At this point, Mr. Boyles called his son and L.S.'s brother, Dr. Rick Boyles. Dr. Boyles, a Seabrook, Texas family practice physician, also attended the wedding and stayed at the hotel. Dr. Boyles testified that the telephone call came at approximately 2:00 a.m. and that when he arrived at his sister's room and first touched her, he thought she was dead. She was ice cold to the touch, unresponsive, bleeding from the nose, and her face appeared to be swollen. With some difficulty, he finally found a pulse. Finding his sister is such serious condition, Dr. Boyles chose not to move her. Instead, he waited for the EMS personnel to arrive. He questioned the defendant concerning the source of the large amount of blood present, and the defendant responded that he did not know. When the EMS

---

[7] Mr. Morris and his sister had also attended the reception and were just returning to the hotel, having visited a number of other bars with Mr. Boyles, Jr., after leaving the reception.

personnel transported L.S. by ambulance to the hospital, Dr. Boyles and his father followed in a separate vehicle.

With regard to this phase of events, the defendant had a different version as well. He testified that Mr. Morris did appear after he moved the truck closer to the hotel entrance and was attempting to remove L.S. from the truck. Because he was having difficulty with her lifeless body,[8] he asked Mr. Morris for help, telling him that L.S. was drunk. When Mr. Morris inquired about the bleeding, he told him that he needed to call her father, and that Mr. Morris should call 911. However, according to the defendant, Mr. Boyles did not answer his telephone and Mr. Morris carried L.S. to their hotel room.

Although blood was found on the hotel parking lot approximately two and one-half to three feet from the truck, the defendant denied that L.S. fell from the truck. Additionally, he disputed Dr. Boyles statement that he did not examine L.S. in the hotel room. He suggested that Dr. Boyles was aware of the source of the blood because he and the defendant had looked up under L.S. and observed a small tear or gash in the rectal area.[9]

After L.S. arrived at the hospital emergency room and had regained consciousness sufficient to communicate to some degree, Ms. Cohen noted that she was anxious, tearful, repeating herself, and wondering what was going to happen to her children. She had a loss of memory and seemed unsure of herself in answering questions propounded to her. In fact, according to Ms. Cohen, L.S. was not even sure she was bleeding. When asked whether common sense suggested that L.S.'s

---

[8] He is six feet two inches tall and weighs 170 pounds while his wife is five feet five inches tall and weighs approximately 105 pounds.

[9] It is not completely clear from the defendant's testimony whether he claims this inspection of L.S. occurred in the hotel room or at the hospital.

condition exhibited that of "a brutal attack and rape[,]" she responded, "Absolutely."

Dr. Boyles testified that when he arrived at the hospital, his sister was already undergoing a CAT scan of the brain[10] and there still appeared no established reason for the excessive bleeding. Fearing she would die if the source of the bleeding was not located and stopped, he again asked the defendant concerning the source of the blood and received the same answer as before. At this point, he became so worried about the defendant's attitude that he instructed his father to not leave the defendant alone with L.S.

According to Dr. Boyles, he, his father, and the defendant were ultimately able to join L.S. in her room, and he said that once she regained consciousness and observed the defendant at the foot of her bed, she became emotional. She looked at the defendant and said, "Get away from me. I know what you did. You never, never should have done that. Get away." When the defendant attempted to place his hand on her, she said, "Don't touch me. Get away." She then told the emergency room doctor that she did not want the defendant in the room, and the doctor had him escorted from the hospital.

Thereafter, the defendant was not allowed to see L.S. during her remaining stay in Lafayette General. In fact, L.S. testified that out of fear for her safety, her patient registration in the hospital was changed to an alias. Before she could completely recover from her injuries, her husband had returned to Texas and filed for a divorce from her. In fact, one of the first things she was faced with when returning to Texas was a January 27, 2011 court appearance relative to the custody of her children. She testified that at that time she was still in intense pain.

_____

[10] The results of this test ruled out any head injury.

The defendant denied that anyone asked him questions concerning the cause of L.S.'s bleeding at the hotel, and he stated that the first time Dr. Boyles questioned him was at the hospital. He acknowledged that L.S. told him to leave, and he complains that he was not given the opportunity to explain anything at the hospital.

Vaginal and anal swabs taken by Ms. Cohen when L.S. was first brought to the emergency room, and a number of other evidentiary items recovered by the police officers involved in the initial investigation were forwarded to the Acadiana Crime Lab in New Iberia, Louisiana, and made subject to testing by Carolyn Booker, a forensic DNA analyst. Ms. Booker found that the vaginal swabs contained both blood and seminal fluids, and, based on her testing procedure, she concluded that the blood was that of L.S. However, she was not able to recover a sufficient amount of DNA from the seminal fluids present to establish the defendant as the donor. She also found evidence of blood and seminal fluids on the front of the boxer shorts worn by the defendant on the evening of December 18, 2010, as well as on the back inner lining of the dress worn by L.S. The blood, in both cases, was determined to be that of L.S., and the seminal fluids, in both cases, was determined to be that of the defendant. Blood found on the right sleeve and front tail of the shirt worn by the defendant on the evening of December 18, 2010, was determined to be that of the defendant. The deposit of blood on the right sleeve extended above the cuff, and the blood on the front of the shirt began from the bottom of the tail and reached above the lower buttons on the shirt's placket.

During their initial investigation, Lafayette Police officers took pictures of the dual-cab truck as well as other items of evidence. A number of the pictures of the interior of the truck reflect the location of blood stains, with the primary blood

12

deposit being located on the center of the front passenger seat, toward the rear of the seat.[11]

The record also contains conflicting expert testimony concerning the cause of L.S.'s injuries. While L.S. testified to a history of sexual abuse at the hands of the defendant, the defendant suggested that she was a willing participant in what he described as "insertion sex." The defendant testified that he and L.S. began dating when they were teenagers and began living together when he was seventeen. He testified that they began having sexual intercourse when they were teenagers and that L.S. was pregnant when they married. According to the defendant, early in their sexual activities, they began anal intercourse and, soon thereafter, began regular experimentation with digital penetration and penetration of L.S.'s anus with sexual toys and other objects.[12]

Dr. Barrios did note that L.S. appeared to have been a victim of years of abuse because of the overall condition of her anal area, but he also concluded that this chronic abuse would not have caused the "acute injury pattern" he saw in this case. When questioned whether the insertion of a penis would have caused this amount of damage, he stated, "A penis wouldn't cause this injury pattern, I can guarantee you that." Additionally, while he recognized that a history of sexual activity involving the anus could have weakened the anus, he also asserted that it would not have caused the trauma to the depth he found in this case. When asked whether a fist could have caused this damage, he stated, "Absolutely, it could." In other words, he found that L.S.' injury did not result from "a chronic history of a deviate sexual practice."

---

[11] While the pictures do show some blood on the side of the front seat next to the door, the blood stains on the center of the seat are predominant.

[12] The defendant acknowledged using a small souvenir baseball bat on occasion.

On the other hand, while acknowledging that L.S.'s injuries are real, Dr. Steven Darbonne, an emergency room and internal medicine physician who, at the time of trial, was working at the Iberia Medical Center in New Iberia, Louisiana, testified for the defendant and concluded that in his medical opinion, the damage to L.S. was caused solely by the insertion of the defendant's two fingers. He based this on the history of the defendant having inserted objects into his wife's anus, suggesting that this activity caused her anus to stretch and to become susceptible to failure from a minor physical contact. He found it hard to believe that a fist could be inserted in the anus, and he suggested that even if it were possible, the fist would have to be inserted a little at a time and not as described by L.S.

In contrast to her trial testimony, L.S. had made statements to medical and law enforcement personnel that did not mention penile insertion. Nothing was said to Ms. Cohen during the initial evaluation, and, when Dr. Barrios attempted to obtain a history from her, he found that she was initially too intoxicated to cooperate. In a later discussion with his patient, she told him that her husband had forced her to drink and that he had forced something into her anus. However, she did not mention penile insertion to the doctor.

Detective Covey Menard, of the Lafayette Police Department, obtained his first statement from L.S. on the morning of December 19, 2010. When he first met L.S., he recognized that she appeared impaired, but he did not know whether the level of impairment was alcohol or medically induced. Despite her condition, L.S. told the detective that the defendant had forced drinks on her at the reception and, after they left the reception, he inserted his fist into her anus. She stated that she told him to stop and that she tried to get away, but that the defendant pulled her back and caused her nose to bleed. The detective specifically asked L.S. if the

defendant had penetrated her with his penis, and she responded that he had placed it in her anus.

Consistent with his normal investigative practice, Detective Menard obtained a follow up statement from L.S. on December 27, 2010, while she was still in Lafayette General. Although she was still heavily medicated, L.S. provided Detective Menard with some additional details of the offense. Specifically, Detective Menard testified that L.S. told him that sometime after she had been placed in the vehicle, the defendant started grabbing her and she tried to get away. She remembered him inserting something in her anus, but was not sure what the object was. She only recalled that it was inserted deep into her anus and that it hurt. She told Detective Menard that at some point, she blacked out. When she came to, she was screaming for him to stop. According to the detective, this time when questioned concerning the penis insertion, L.S. stated that she thought he had, but was unsure. She simply did not remember at this point in time. However, she specifically recalled seeing his bloody shirt cuff.

When questioned concerning the content of her prior statement, L.S. testified that she remembered very little immediately after the offense and that by time she made the second statement to Detective Menard, she was still unclear concerning what was going on. She was afraid for the safety of her children and had been told that individuals in Texas were already pilfering her personal property. In fact, she was so fearful of her safety that she was registered in the hospital under an alias. She did recall that when she spoke to the investigating officer she was still lying in her own body waste in the hospital bed, but that she remembered little of what she may have related to the officer.

15

Concerning L.S.'s ability to resist to the utmost, the defendant points out that her urine-alcohol content when she first arrived at Lafayette General, was .312.[13] While no witness directly discussed the effect such a finding would have on anyone in the general population, much less L.S. individually, Dr. Boyles did testify that when he was told of his sister's intoxication level by the emergency room, he recognized that she "was getting close to a lethal level." Thus, the defendant argues, L.S. was too intoxicated to resist to the utmost and, even assuming a finding of penile insertion, the offense was simple rape and not aggravated rape.[14]

The jury obviously believed that the defendant committed anal or vaginal sexual intercourse with L.S., without her lawful consent, and in a situation where she resisted to the utmost and where the defendant overcame her resistance by force. La.R.S. 14:42(A)(1). Viewing all the evidence in the light most favorable to the state, we find that the jury functioned as a rational trier of fact in finding that the state proved each of the essential elements of aggravated rape beyond a reasonable doubt. *Leger*, 936 So.2d 108.

L.S.'s version of what occurred on the evening of December 18, 2010, is supported by both testimonial and physical evidence. The blood on the tail and sleeve of the defendant's white shirt, the location of the major blood stain in the truck, the degree of damage suffered by L.S., and the testimony of Dr. Barrios all

---

[13] A blood-alcohol content of .08 is sufficient to convict an individual of operating a vehicle while intoxicated. La.R.S. 14:98(A)(1)(b). However, Dr. Darbonne disputed this finding by the emergency room personnel. He testified that the medical staff at Lafayette General should have taken a blood sample rather than a urine sample. In his experience, a urine sample is not accurate, and a .312 urine sample reading could equate to a blood sample anywhere between .174 and .332.

[14] The defendant relies on the definition of simple rape found in La.R.S. 14:43(A)(1), which is a rape without lawful consent "[w]hen the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim's incapacity."

support L.S.'s assertion that the defendant inserted his fist into her anus, and the jury obviously rejected the defendant's assertion that the damage was caused by the insertion of two fingers of his right hand into L.S.'s anus. L.S.'s assertion that the defendant was directly in front of her in the seat and that he inserted his penis into her vagina while holding her in place with his fist inserted in her anus is also supported by the physical evidence. The location of the major blood stain in the truck discounts the defendant's claim that he was outside the truck masturbating while causing his wife massive injury with two fingers or that she was such a willing participant from the moment he opened the truck door. Furthermore, L.S.'s version of where she was positioned in the truck is supported by the blood on the tail of the defendant's shirt. For that portion of his shirt to have come into contact with L.S.'s bleeding genital area, the defendant would have had to be directly in front of her in close proximity and not outside the truck. This same rationale applies to the fact that the defendant's boxer shorts came into contact with L.S.'s bleeding body and that the defendant's seminal fluids were found mixed with L.S.'s blood on both the shorts and the inner back lining of her dress. We find no error in the jury's obvious determination that penile insertion occurred.

The jury also obviously rejected the defendant's position that L.S. was too intoxicated to resist the rape to the utmost. While the defendant relies on the emergency room urine alcohol-content finding of .312 in this argument, we note that the defendant disputed her level of intoxication in his own testimony when he asserted that he and L.S. communicated with each other while traveling from the reception to the hotel. We also note that the defendant's own expert testified that the emergency room finding was inaccurate because it was based on a urine analysis and that the actual blood alcohol content could have been anywhere between .174 and .332.

With regard to the inconsistent statements made by L.S. within the short period after the offense, the jury could have considered the degree of trauma she had suffered, as well as the extent of her permanent injuries, and considered her trial testimony as being more accurate.

We find no merit in this assignment of error.

### *Assignment of Error Number One*

In this assignment of error, the defendant asserts that the trial court erred in prohibiting him from introducing videos depicting him and L.S. engaged in consensual sex acts[15] involving the insertion of various objects into her anus or vagina. At a pretrial hearing held on May 10, 2012, the trial court granted the state's motion requesting that the videos not be admitted into evidence.

Louisiana Code of Evidence Article 402 provides, in part, that "[e]vidence which is not relevant is not admissible." Additionally, La.Code Evid. art. 403 provides, in part, that even if evidence is found to be relevant, it may be excluded "if its probative value is substantially outweighed by the danger or unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." At the May 10, 2010 hearing, the trial court first found that the videos were not relevant "because of the nature of the videos versus the nature of the alleged act[.]" However, the trial court went further in its reasons for rejecting the video and seemed to suggest that even if relevant, they would not meet the balancing test of La.Code Evid. art. 403.

We find no error in the trial court's ruling. The defendant testified in detail concerning what he claims was the history of "insertion sex" between him and his wife, but, as pointed out by the trial court, a history of consensual deviate sexual

---

[15] The defendant refers to these acts as "insertion sex."

activity does not justify an act of nonconsensual activity otherwise defined as a criminal act. Accordingly, we find no merit in this assignment of error.

### *Assignment of Error Number Two*

In his second assignment of error, the defendant asserts that the trial court erred in allowing the trial to be "infected with the rampant admission of bad character evidence." Specifically, the defendant complains of aspects of the testimony of L.S., Sergeant Richard Gilbert, Dr. Barrios, and Mr. Boyer. He asserts that in their testimony, the trial court allowed the admission of evidence of irrelevant and prejudicial bad acts and other crimes evidence in violation of the defendant's state and federal constitutional rights.

With regard to the testimony of L.S., the defendant complains of her assertions of prior sexual assaults and general abuse. L.S.'s testimony painted a picture of a controlling and abusive husband who, for the last ten to fourteen years of their marriage, made every moment of her existence miserable. According to L.S., the defendant dictated her wardrobe, her social involvement, her involvement with her children, and even her personal hygiene activities.[16] When anything occurred of which he disapproved, the response was instant and usually violent.[17] While she tried to hold her own in public disagreements, there were always consequences when she returned home. She testified that acts of rape by her husband were daily and often multiple and that she chose not to try to leave the environment out of fear for the safety of her children and her immediate family.

With that background in mind, L.S. testified that the morning of December 18, 2010, was no different from any other day. She woke up to another act of

---

[16] L.S. testified that she was not even allowed to trim her pubic hair. That, she claimed, was done at the discretion of her husband.

[17] L.S. described instances where he would cut up clothes that she acquired without his permission, destroyed presents she received from others, and threatened to harm her and the children if she did not obey his every command.

19

involuntary sexual intercourse with her husband and then had to await his return from having his hair braided before the family could leave their Texas home for Louisiana. When she expressed a concern that they might be late for the wedding, he began driving erratically. Her fears for the family's safety were met with more erratic driving tactics and, on one occasion, he simply stopped in the middle of the highway and killed the engine.

L.S. testified that at the reception, the defendant immediately started forcing her to consume shots of Tequila and began buying rounds for other wedding guests. She did not want the alcohol, but drank it out of fear that he would cause a scene and ruin the wedding. At some point during the evening, they became involved in a dispute with one of the bartenders and would have been thrown out of Abacus but for Kenneth Boyles, Jr. intervening and talking the manager into letting them stay.[18]

The defendant presented substantial testimony in response to these assertions through the testimony of his brother, Clint Dwayne Stevens; his father, Ted Dwayne Stevens, Sr.; his aunt, Sharon Rayleene Stevens; and her son-in-law and daughter, Dennis Mike Berberich, Jr. and Jaci Jo Berberich. All of these witnesses testified that the defendant was the active parent for the three children and that L.S. had little to do with the responsibilities associated with raising the children. They all also denied that the defendant was the dominant figure in the marriage and strongly suggested that L.S. suffered from either a drinking or substance abuse problem. While seeming to have no knowledge of what occurred on December 18, 2010, or of the significance of the injuries sustained by L.S., all of these witnesses

---

[18] The testimony of Mr. Boyles, Jr. supported L.S.'s testimony concerning the bartender incident.

testified that L.S. openly discussed her sex life with them on a regular basis and that she usually was the one instigating the conversation.

The defendant even called their thirteen-year-old son to testify against his mother. The young man provided no information concerning the evening of December 18, 2010, but suggested that he had seen his mother intoxicated at least twice per week prior to that time. He never saw his father drive erratically on the trip from Texas, and he noted that his mother spent the whole time on her cell phone. While he noted that his parents argued every day, he did not believe that his father dominated his mother. According to the young man, approximately two months before the trial, he returned home one afternoon and observed his mother drinking and smoking "those big long white things." He went to a friend's house and, when he returned later, he found his mother on the floor "passed out, naked, [and] intoxicated."

On cross-examination, the young man denied ever seeing his father hit his mother, but admitted getting between them and holding a knife on his father on one occasion. He also acknowledged that he had heard his mother crying and screaming in the past when his "dad was manhandling her." He also admitted that he had spent the weekend before trial with his father and stated that he came to testify "to make sure my father did not go to prison."

Sergeant Gilbert is a Special Victim's Unit Investigator with the Sheriff's Department in Harris County, Texas. He testified that in November of 2010, he responded to a 911 call and seized items[19] which now constitute evidence against the defendant in sixty-five Texas sexual-assault complaints, where L.S. is the

_____

[19] Sergeant Gilbert described the objects as a baseball bat, bottles, and other similar objects.

victim. According to Sergeant Gilbert, at the time of this trial, the defendant had been arrested on one of the complaints.

The complaint with regard to Dr. Barrios's testimony is that he was improperly allowed to testify concerning the medical history he obtained from L.S. Specifically, the defendant objects to Dr. Barrios relating that portion of the medical history related to prior injuries she sustained when the defendant placed objects into her anus.

With regard to the testimony of all of these witnesses, as well as the testimony of Mr. Boyles, the defendant first asserts that the state failed to provide him proper pretrial notice of the bad character or other crimes evidence that these witnesses ultimately testified to and that this failure violated the requirements of *State v. Prieur*, 277 So.2d 126 (La.1973). In reviewing the record, however, we find no *Prieur*-based objections expressed by the defendant at trial other than a sidebar complaint during L.S.'s testimony that he had not received proper notice of the other crimes or bad acts she was testifying to. In response, the state argued that the defendant had opened the door to such evidence in opening statements when the defendant's counsel informed the jury that L.S. had a history of sexual activity that included the insertion of objects into her anus. "[W]hen a defendant opens the door to such evidence, *Prieur* notice is not required." *State v. Marcotte*, 01-1586, p. 13 (La.App. 3 Cir. 5/15/02), 817 So.2d 1245, 1253, *writ denied*, 02-1687 (La. 2/7/03), 836 So.2d 96. We find no merit in this portion of the defendant's assignment of error.

Considering the complaints addressed toward the testimony of L.S., we do note that the record contains objections voiced by the defendant during her testimony. However, none of these objections were as to the relevance of the testimony. With regard to the testimony of Sergeant Gilbert and Dr. Barrios, the

22

defendant voiced no objection to the testimony to which he now complains. In the case of all three of these witnesses, the defendant failed to preserve these issues for review on appeal. La.Code Crim.P. art. 841; La.Code Evid. art. 103. Therefore, we find no merit in these portions of the defendant's assignments of error.

We do, however, find that the defendant did voice a relevancy objection to a portion of Mr. Boyles' testimony. Mr. Boyles testified that the defendant was dominant in his relationship with L.S. and that when he was around the defendant and L.S., he observed that L.S. was always required to sit next to the defendant, wear buttoned-down clothes, only read approved magazines, and ride in the back seat of the truck. The defendant objected to this line of questioning on the basis of relevance, and the trial court overruled the objection. When the state renewed this line of questioning, the defendant requested a sidebar conference outside the presence of the jury and, at that conference, renewed his relevancy objection. The trial court again overruled his objection.[20]

Thus, the defendant preserved only his objection to Mr. Boyles' testimony for appellate review. With regard to this issue, the supreme court has explained:

> The fundamental rule in Louisiana governing the use of evidence of other crimes, wrongs, or acts is, and has been, such evidence is not admissible to prove the accused committed the charged crime because he has committed other such crimes in the past or to show the probability he committed the crime in question because he is a man of criminal character. *State v. Lee*, 05-2098, p. 44 (La.1/16/08), 976 So.2d 109, 139; *State v. Patza*, 3 La. Ann. 512 (1848).

> Nevertheless, although evidence of other crimes, wrongs, or acts may not be admitted to prove the accused is a person of criminal character, evidence of other crimes has long been admissible if the state establishes an independent and relevant reason for its admission. *See State v. Anderson*, 45 La. Ann. 651, 654, 12 So. 737, 738 (1893).

---

[20] The defendant also complains that Mr. Boyles' testimony concerning the pending divorce was prejudicial, but did not voice a relevancy objection at trial. Thus, he did not preserve this issue for appellate review. La.Code Crim.P. art. 841; La.Code Evid. art. 103.

This very principle is embodied in our Code of Evidence at Article 404(B)(1), which provides, in pertinent part:

> Except as provided in Article 412 [regarding a victim's past sexual behavior in sexual assault cases], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.

La.Code Evid. art. 404(B)(1). While still prohibiting the state from introducing evidence of other crimes, wrongs, or acts to show a probability the accused committed the charged crime because he is a "bad" person, the rule articulated in Article 404(B)(1) allows admission for other purposes, *i.e.*, to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La.Code Evid. art. 404(B)(1); *Lee*, 05-2098 at p. 44, 976 So.2d at 139; *State v. Kennedy*, 00-1554, p. 5 (La.4/3/01), 803 So.2d 916, 920.

Several other statutory and jurisprudential rules also govern the admissibility of other crimes evidence even when one or more of these permitted purposes is asserted. *State v. Miller*, 98-0301, pp. 3-4 (La.9/9/98), 718 So.2d 960, 962. Foremost, at least one of the enumerated purposes in Article 404(B)(1) must have substantial relevance independent from showing defendant's general criminal character in that it tends to prove a material fact genuinely at issue. *Lee*, 05-2098 at p. 44, 976 So.2d at 139; *State v. Moore*, 440 So.2d 134, 137 (La.1983).

Moreover, the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. *Lee*, 05-2098 at p. 44, 976 So.2d at 139; *State v. Hatcher*, 372 So.2d 1024, 1027 (La.1979). Separate and apart from the showing of relevancy and prejudice, the state must also prove the defendant committed the other acts, *Lee*, 05-2098 at p. 44, 976 So.2d at 139, and satisfy the requirements set forth in *Prieur, i.e.,* the state must provide the defendant with notice before trial it intends to offer prior crimes evidence.

Logically, it falls to the trial court in its gatekeeping function to determine the independent relevancy of such evidence and balance its

probative value against its prejudicial effect. La.Code Evid. art. 403; *Huddleston v. United States*, 485 U.S. 681, 690-91, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988). Upon finding such relevance, the court must then balance all the pertinent factors weighing in favor of and against its admissibility. *See* C. McCormick, *Evidence* § 190, 768 (6th ed.2006). In this analysis, the court seeks to answer the question: Is this evidence so related to the crime on trial or a material issue or defense therein that, if admitted, its relevancy will outweigh the prejudicial effect, which the defendant will necessarily be burdened with?

The trial court's answer to this question and its corresponding ruling on the admissibility of the additional other crimes evidence will not be disturbed absent an abuse of discretion, *State v. Scales*, 93-2003, pp. 4-5 (La.5/22/95), 655 So.2d 1326, 1330-31, *cert. denied*, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996). Finally, the erroneous admission of other crimes evidence has long been held subject to harmless error review. La.Code Crim. Proc. art. 921; *State v. Johnson*, 94-1379, pp. 14-15 (La.11/27/95), 664 So.2d 94, 100-01 (errors leading to improper admission of evidence subject to harmless-error analysis; error harmless if verdict "surely unattributable" to error)(quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).

*State v. Garcia*, 09-1578, pp. 53-55 (La. 11/16/12), 108 So.3d 1, 38-39, *cert. denied*, __ U.S. __, 133 S.Ct. 2863 (2013) (alteration in original).

In the present case, it is questionable whether this singular reference to the defendant's controlling nature had any probative value in this case. It is equally questionable how much prejudice such evidence generated. As we previously noted, L.S. sustained significant injuries and the jury heard other potentially prejudicial "bad acts" evidence which was admitted absent a proper objection by the defendant. The reference by Mr. Boyles is minor considering the complete record before us, and we do not find that it was more prejudicial than probative or that the verdict could be found to be attributable to the admission of this evidence. The evidence, arising from these offenses, as a whole is of such a grotesque nature that there is little likelihood that the allegations of the defendant's controlling nature contributed significantly to the convictions. We find no merit in this portion of the defendant's assignment of error as well.

25

### Assignment of Error Number Four

In this assignment of error, the defendant argues that the trial court erred by denying his motion for mistrial when the state, in its cross examination of his aunt, referred to the other crimes evidence testified to by Sergeant Gilbert. As previously noted, the defendant failed to object when the state presented the testimony of Sergeant Gilbert.

The defendant's complaint relates to the state's question to Ms. Stevens concerning her knowledge of the defendant's criminal difficulties in Texas. Specifically, the state asked Ms. Stevens, "Would you be surprised if Houston is sitting on sixty-five (65) felonies --?" Before the state could finish the question, the defendant interrupted with an unspecified objection, and the court immediately sustained the objection. The defendant further asked that the court instruct the jury to disregard the question, and the court so instructed the jury. The defendant then moved for a mistrial, and the trial court rejected the motion.

The defendant now asserts on appeal that La.Code Crim.P. art. 770 mandates a mistrial and that the trial court erred in not granting the motion. However, as this court has explained in *State v. Evins*, 626 So.2d 480, 494 (La.App. 3 Cir. 1993), "under LSA-C.Cr.P. art. 770, a mistrial is mandated solely when the evidence as to another crime committed or alleged to have been committed by the defendant is not admissible." In the present case, the evidence concerning the criminal charges in Texas had already been admitted without objection. Thus, the trial court did not err in rejecting the mistrial motion, and we find no merit in this assignment of error.

### Assignment of Error Number Five

In this assignment of error, the defendant asserts that the trial court erred in admitting double hearsay through the testimony of Dr. Boyles, who was accepted

by the trial court as an expert in the field of family medicine. Specifically, the defendant references Dr. Boyles' testimony concerning statements made to him by the emergency room physician.

The defendant complains of Dr. Boyles' testimony concerning what he was told by the emergency room physician in response to his question regarding whether his sister's injuries arose from consensual activity. According to Dr. Boyles, the physician told him, "No human could consent to that." The defendant voiced no objection to this testimony at trial, and the issue is not preserved for appeal. La.Code Crim.P. art. 841; La.Code Evid. art. 103. Thus, we find no merit in this assignment of error.

### Assignment of Error Number Six

In his sixth assignment of error, the defendant argues that the state improperly cross-examined him regarding his post-arrest silence, as prohibited by *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240 (1976). Again, when this cross-examination occurred, the defendant failed to voice a contemporaneous objection. Furthermore, the defendant failed to object when the state referred to the defendant's post-arrest silence during its closing argument. Therefore, this issue has not been preserved for review. La.Code Crim.P. art 841; La.Code Evid. art. 103. Thus, we find no merit in this assignment of error.

### Assignment of Error Number Seven

In this final assignment of error, the defendant argues that his convictions are unconstitutional, since the jury votes were not unanimous. It does not appear that the defendant raised this issue below, either by contemporaneous objection or by pretrial constitutional challenge. Thus, this issue has not been preserved for review. La.Code Crim. P. art 841; La.Code Evid. art. 103; La.R.S. 13:4448. We find no merit in this assignment of error.

27

## DISPOSITION

For the foregoing reasons, we affirm the defendant's convictions in all respects.

**AFFIRMED.**